UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RICHARD LIGHT,<br>Personal Representative of<br>the Estate of Michael Weaver<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF LIVERMORE, AMY BYRON,<br>AARON MILLER, JAMES MANTER,<br>MARK CHRETIEN, BRETT DEYLING,<br>SCOTT RICHMOND, BENJAMIN GUILD,<br>AND TRACEY MARTIN, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)        1:21-cv-00266-JAW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER ON MOTIONS TO DISMISS**

A municipality files motions to dismiss a medical marijuana caregiver's four-count complaint seeking judicial review pursuant to Rule 80B of the Maine Rules of Civil Procedure; alleging, pursuant to 42 U.S.C. § 1983, violations of his equal protection, procedural due process, and substantive due process rights; asserting violations of Maine's Freedom of Access Act; and seeking a declaratory judgment. The Court concludes that the plaintiff has not stated a valid claim on which relief can be granted pursuant to Rule 80B, for constitutional violations pursuant to 42 U.S.C. § 1983, or for declaratory judgment. The Court grants the defendants' motions to dismiss for all counts, except the Freedom of Access Act count, which the Court remands to state court.

## I.     PROCEDURAL HISTORY

On July 8, 2021, Michael Weaver filed a complaint against the town of Livermore, Amy Byron, Aaron Miller, James Manter, Mark Chretian, Brett Deyling, Scott Richmond, Benjamin Guild, and Tracey Martin (Defendants) pursuant to 42 U.S.C. § 1983 alleging violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution and petitioning for judicial review pursuant to Maine Rule of Civil Procedure 80B. *State Ct. R.* (ECF No. 3) (*State Ct. R.*), Attach. 1, *Compl. & M.R.CIV.P. 80B Pet. for Judicial Review* (*Compl.*). On September 14, 2021, the Defendants filed a notice removing the case from state to federal court. *Notice of Removal* at 1-2 (ECF No. 1). On September 15, 2021, the Defendants answered the Complaint. *Answer* (ECF No. 4).

On September 15, 2021, the Defendants filed a motion for judgment on the pleadings as to Count II of the Complaint. *Defs.' Mot. for J. on the Pleadings as to Count II* (ECF No. 5). On October 6, 2021, Mr. Weaver filed his First Amended Complaint, which added a third claim for violation of the Maine Freedom of Access Act (FOAA). *Am. Compl. & M.R.CIV.P.80B Pet. for Judicial Review* (ECF No. 8) (*Am. Compl.*). The Defendants subsequently withdrew their motion for judgment on the pleadings on October 15, 2021. *Notice of Withdrawal of Defs.' Mot. for J. on the Pleadings* (ECF No. 9).

On November 2, 2021, the Defendants filed a motion to dismiss Mr. Weaver's First Amended Complaint. *Defs.' Mot. to Dismiss Am. Compl. for Failure to State a Claim* (ECF No. 14) (*Defs.' Mot.*). On December 3, 2021, Mr. Weaver responded in opposition to the Defendants' motion to dismiss. *Pl.'s Opp'n to Defs.' Mot. to Dismiss*

*Am. Compl. for Failure to State a Claim* (ECF No. 18) (*Pl.'s Opp'n*).  On December 14, 2021, the Defendants replied.  *Defs.' Reply in Supp. of Mot. to Dismiss Am. Compl.* (ECF No. 19) (*Defs.' Reply*).  On July 6, 2022, following Mr. Weaver's death, his son, Richard Light, the personal representative of Mr. Weaver's estate, moved to be substituted as Plaintiff for Mr. Weaver.  *Mot. to Substitute Parties Pursuant to the Death of Michael Weaver* (ECF No. 22) (*Mot. to Substitute*).  The Court granted the motion the same day.  *Order* (ECF No. 23) (*Substitution Order*).

On July 26, 2022, Mr. Light filed a motion for leave to file a second amended complaint.  *Mot. for Leave to File Second Am. Compl.* (ECF No. 25) (*Mot. to Am.*).  On August 8, 2022, the Court granted the Plaintiff's motion to amend, *Order on Mot. to Am.* (ECF No. 28) (*Order on Mot. to Am.*), and the Plaintiff filed his Second Amended Complaint that same day.  *Second Am. Compl. and M.R.Civ. P. 80B Pet. for Judicial Review* (ECF No. 29) (*Second Am. Compl.*).  The Plaintiff's Second Amended Complaint is now the operative complaint.  On August 11, 2022, the Defendants answered the Second Amended Complaint and filed a motion to dismiss Count IV of the Second Amended Complaint.  *Defs.' Answer to Second Am. Compl. and M.R. Civ. P. 80B Pet. for Judicial Review* (ECF No. 30); *Defs.' Mot. to Dismiss Count IV of the Second Am. Compl.* (ECF No. 31) (*Defs.' Count IV Mot.)*.  Plaintiff did not file a response motion to Defendants' motion to dismiss Count IV.

In its order granting Mr. Light's motion for leave file a second amended complaint, the Court explained that it would address the Defendants' newly raised

3

mootness and standing arguments in resolving the pending motions to dismiss. *Order on Mot. to Am.* at 8 (ECF No. 28).

## II.    FACTS[1]

Mr. Weaver is deceased but was a licensed medical marijuana caregiver in Livermore, Maine, (Livermore or the Town), operating his caregiver business for the last seven years. *Second Am. Compl.* ¶¶ 1, 15-17.   Richard Light is the Personal Representative of Mr. Weaver's estate. *Id.* ¶ 2.   From late 2019 to on or about July 29, 2020, Livermore began drafting a medical marijuana ordinance. *Id.* ¶ 18.   During this same period, Mr. Weaver was attempting to have his business licensed as a medical marijuana retail store. *Id.* ¶ 19.

### A.    Michael Weaver's Application for a Medical Marijuana Retail Store License

On several occasions, over several months, Mr. Weaver inquired with Town officials, including Amy Byron, whether he could apply for a license as a retail medical marijuana store. *Id.* ¶ 19.   Mr. Weaver was told repeatedly that he could not. *Id.* Nevertheless, Mr. Weaver came to learn that other businesses, whose security was substandard to that at his establishment, were granted licenses while he was not permitted to apply. *Id.*   Upon learning that other businesses were being licensed as medical marijuana retail stores, Mr. Weaver submitted an application and site plan for review, based on what he surmised to be the necessary requirements. *Id.* ¶ 21.

---

[1]    Consistent with Federal Rule of Civil Procedure 12(b)(6), in describing the facts, the Court has relied upon the allegations in the Plaintiff's Second Amended Complaint. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68 (1st Cir. 2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) ("We examine whether the operative complaint states a claim for which relief can be granted when we construe the well-pleaded facts in the light most favorable to the plaintiffs, accepting their truth and drawing all reasonable inferences in plaintiffs' favor" (internal citation omitted)).

In late November 2019, Mr. Weaver submitted his site plan to the Planning Board at a scheduled Planning Board meeting. *Id.* ¶ 22. Members of the Planning Board told Mr. Weaver to "get the fuck out" of the meeting and to get "his shit" (presumably referencing his application) "and leave." *Id.* Mr. Weaver also alleges that because of his throat cancer and inability to speak clearly, he was told he should have someone serve as his spokesman so that the Board could understand him. *Id.* Mr. Weaver characterized the Planning Board members as "hostile, abrasive, intimidating, and rude." *Id.*

Out of fear that such information would not be reflected in the public record, Mr. Weaver began recording the meeting on his phone. *Id.* This was noted in the Town's meeting minutes, as well as "things got heated." *Id.* One Planning Board member exclaimed, "I don't do recording" and when Mr. Weaver responded, the Planning Board member declared, "I didn't ask for a report." *Id.* Mr. Weaver alleges that this Planning Board member later physically attempted to knock the phone out of his hand. *Id.* The Planning Board ultimately tabled Mr. Weaver's application. *Id.* In a subsequent communication, Livermore's Code Enforcement Officer admitted that the Planning Board gave Mr. Weaver a "hard time." *Id.*

## B.    The Site Visit

In December 2019, several Planning Board members conducted an unnoticed meeting and performed a walkthrough of Mr. Weaver's building. *Id.* ¶ 23. He says the Board members peppered him with irrelevant questions about code compliance, which Mr. Weaver alleges revealed "hostility and opposition" to the operation of his business. *Id.* Mr. Weaver requested that the Code Enforcement Officer be there to

address these questions, but he was not. *Id.* Mr. Weaver alleges that no other medical marijuana retail business had a similar walkthrough or experienced such hostility. *Id.*

During the walkthrough, the Planning Board members expressed concerns about Mr. Weaver's proximity to an infrequently used baseball field and a speech therapist's office. *Id.* Mr. Weaver says that these "concerns" later became the mechanisms through which he was prevented from operating his retail business through the passage of, and amendment to, the Town's marijuana ordinance. *Id.* During the walkthrough, Mr. Weaver expressed to James Manter, who later became a primary proponent of the ordinance, that he did not want to go through all the hoops only to have the Ordinance preclude him from operating. *Id.*

## C. The Planning Board Meets to Discuss Michael Weaver's Application

In late December 2019, the Planning Board held another meeting, allegedly to accept Mr. Weaver's license application. *Id.* ¶ 25. The Code Enforcement Officer indicated that there were no issues with the application and recommended that "it should be approved." *Id.* Mr. Manter again raised the proximity of Mr. Weaver's business to the speech therapist's office, which the Code Enforcement Officer indicated was not an issue. *Id.* The Board thereafter unanimously voted to approve Mr. Weaver's license. *Id.* Upon conclusion of that portion of the meeting, Mr. Weaver was told he was "good to go," but the Board nonetheless indicated that another meeting was necessary to approve the license. *Id.* The process was confusing to Planning Board members and to Mr. Weaver and differed substantially from other

business' approvals. *Id.* Neither the Planning Board nor Town staff were clear on who should vote, when they should vote, or under what conditions a vote should be taken. *Id.*

Immediately after approving Mr. Weaver's application, the Board proceeded to discuss a draft of the marijuana ordinance. *Id.* ¶ 26. The primary issues discussed were distances to "safe zone" areas and, as raised by Mr. Manter, the distance from Mr. Weaver's property to the baseball field. *Id.*

On January 6, 2020, the Planning Board held a hearing, officiated by attorney Clint Boothby on behalf of the Board, to resolve all remaining issues related to Mr. Weaver's application. *Id.* ¶ 27. At the beginning of the meeting, the Town established that no individual members of the public would need to vote. *Id.* Mr. Weaver inquired into why this process differed from the typical licensing process and was told that the process was legitimate and that other procedural processes were, according to James Manter, before his time. *Id.* Mr. Weaver was told that the "protocol" was to act on his business license application so he could operate a medical marijuana retail store. *Id.* Mr. Weaver again noted that the hearing was conducted differently than it had been with other applicants. *Id.* Issues of the baseball field and a nearby daycare were again raised. *Id.* The Board approved Mr. Weaver's application and he was told he could start operating his business. *Id.*

Following the hearing, Mr. Weaver made several requests that the Town provide him his license. *Id.* ¶ 28. However, unlike other applicants, he never received one. *Id.* Mr. Weaver alleges that the Board and Town's treatment of his application

was different from their treatment of another business, Inside Out Indoor Garden Supply, which was licensed in June 2019 during the same period when Mr. Weaver was told he could not apply. *Id.* ¶ 30. Mr. Weaver says Inside Out's application was streamlined and approved, despite known deficiencies in the store's security, and that Mr. Manter spoke favorably about the business when challenging Mr. Weaver's application. *Id.*

### D.    Livermore's Marijuana Ordinance

During this same period, Livermore was contemplating passage of a marijuana ordinance.   Mr. Weaver contends that the individuals who drafted Livermore's medical marijuana ordinance did so in a manner that permitted other medical marijuana businesses to operate but not Mr. Weaver's. *Id.* ¶ 31. In an unnoticed Planning Board meeting conducted via email regarding the proposed fee structure for the proposed ordinance, which Mr. Weaver contends was in violation of Maine's Freedom of Access Act, Board members indicated their understanding that the drafted ordinance may get "pushback" from Mr. Weaver and noted that "[w]e know this will not be the last of the issues he will bring up as we move forward." *Id.* ¶ 32. The Board members noted it was necessary to "stand our ground" otherwise "we will have further issues once we give in this time." *Id.* As noted in the email meeting:

> [t]he fees will bring addition[al] money to the town and may deter additional care givers [who] want to open in our town.  We did expect Mr. Weaver would give some push back as he has done with every issue he has presented to us.  I'm not sure how much history this current select board has had dealing with Mr. Weaver.

*Id.*

Mr. Weaver inquired several times with the Town and Town officials what would happen if he re-applied for a license under the ordinance and was told he would be denied. *Id.* ¶ 33.

Livermore's original medical marijuana ordinance prohibited a medical marijuana business from operating within 500 feet of a municipal "safe zone" pursuant to 30-A M.R.S. § 3253 or within 1,000 feet of a licensed daycare under 10-148 C.M.R. c.32 Section 10A.2.b.  *Id.* ¶ 34.  The original ordinance also prevented medical marijuana businesses from operating within 500 feet of a place of religious worship and related religious activity, public or private schools, or recreational areas designed for use by children up to eighteen years of age, or within 1,000 feet of another property containing a building with one or more medical marijuana businesses.  *Id.* ¶¶ 37-38.  The amended ordinance further describes how to measure the setback requirements, which are measured from the property line of each parcel of property.  *Id.* ¶ 40.

Livermore initially only sought to prohibit medical marijuana businesses from being within 1,000 feet of a "school."  *Id.* ¶ 36.  Upon learning that a nearby privately-owned company providing speech therapy to children was not, under Maine law, considered a "school," Livermore expanded the prohibition to include childcare facilities.  *Id.* ¶ 37.  Mr. Weaver alleges that this was an attempt to preclude his business from operating.  *Id.*  Livermore also designated the baseball field near Mr. Weaver's medical marijuana business a municipal "safe zone."  *Id.* ¶ 35.

### E.     Michael Weaver's Property

Mr. Weaver owns two adjoining lots in Livermore with one lot for his medical marijuana caregiving and retail location; the other vacant and unused. *Id.* ¶ 41. Mr. Weaver's vacant lot is within 500 feet of the safe zone. *Id.* ¶ 42. Livermore represented that it would measure Mr. Weaver's medical marijuana location from the vacant lot, which would render his property noncompliant with the medical marijuana ordinance. *Id.* ¶ 43.

Under Livermore's medical marijuana ordinance, a medical marijuana business is required to have metal bars on its windows. *Id.* ¶ 44. During the inspection Livermore advised Mr. Weaver that the metal grating on his windows was compliant with security measures. *Id.* ¶ 45. No other medical marijuana retail store had or has those bars, yet they were approved for operation by the Board, and their approval was deemed satisfactory for continued operation as duly licensed retail businesses subsequent to passage of the ordinance. *Id.*

### F.     Michael Weaver's Participation in the Ordinance Process

Mr. Weaver participated in all known public meetings about the marijuana ordinance, which took place over Zoom. *Id.* ¶¶ 46-47. However, due to Mr. Weaver's physical disabilities, which make hearing his voice difficult over videoconference, his participation was either unheard or he was ignored and spoken over. *Id.* ¶ 46. Mr. Weaver attempted to explain to Livermore that the passage of the proposed medical marijuana ordinance would harm his business and the business of other medical marijuana caregivers in the community. *Id.* ¶ 47.

On July 29, 2020, Livermore held a virtual hearing by Zoom regarding the proposed ordinance; approximately seven people attended. *Id.* ¶ 48. On August 4, 2020, Mr. Weaver mailed Livermore a letter requesting the municipal authorization of his medical marijuana business as required by the Site Plan Review Ordinance. *Id.* ¶ 49. The Town never responded or acted upon Mr. Weaver's letter requesting municipal authorization. *Id.* ¶ 50.

During the drafting of the marijuana ordinance, Mr. Weaver routinely called and visited Livermore's Town Office to obtain copies of the proposed ordinance and learn when the ordinance would be voted on by the public. *Id.* ¶ 51. Livermore's Town Office was frequently closed to the public, and Mr. Weaver was otherwise given the "run around" with respect to his approved license and the marijuana ordinance. *Id.* ¶ 52. When Livermore finally delivered a copy of the ordinance to Mr. Weaver, it was an older draft. *Id.* ¶ 53. Ahead of Livermore's virtual hearing on the proposed medical marijuana ordinance, Livermore employee Amy Byron provided Mr. Weaver with an earlier and outdated draft of the proposed ordinance. *Id.* ¶ 54.

### G.    Livermore's Passage of the Ordinance

Mr. Weaver alleges that Livermore did not properly enact its proposed medical marijuana ordinance because Livermore did not post the proposed ordinance in the manner required for town meetings, as set forth in 30-A M.R.S. § 3002(1), did not post the proposed ordinance in a conspicuous, public place, and the proposed ordinance exceeded ten pages in length. *Id.* ¶¶ 55-58.

A Livermore employee, Aaron Miller, having conferred with Ms. Byron, confirmed that there was only one ordinance warrant relating to the medical

marijuana ordinance. *Id.* ¶ 59. Mr. Miller provided an unexecuted copy of the medical marijuana ordinance warrant to Mr. Weaver, which Livermore represented as being identical to the executed copy of the medical marijuana ordinance warrant. *Id.* ¶¶ 60-61. Mr. Weaver alleges that the warrant did not meet the legal requirements for posting of a proposed ordinance exceeding ten pages as required by 30-A M.R.S. § 3002(1). *Id.* ¶ 62.

### H.   The Vote

On August 7, 2020, Livermore voted to adopt the proposed medical marijuana ordinance. *Id.* ¶¶ 63-64. The ordinance was enacted August 12, 2020. *Id.* ¶ 64. Since the ordinance's passage, Mr. Weaver is the only individual or business to be denied previously approved authorization to operate as a retail medical marijuana business. *Id.* ¶ 65. On several occasions, Mr. Weaver requested that the Town honor the Board's prior approval of his license. *Id.* ¶ 66. Mr. Weaver alleges that Town officials guided other businesses through a far simpler process that resulted in licensure without fulfilling all requirements of the ordinance, which his business meets. *Id.* ¶ 67.

### I.   Amendment to the Ordinance

On May 8, 2021, the Town held a Zoom meeting regarding amendments to the medical marijuana ordinance. *Id.* ¶ 68. These amendments included increasing the required distance between medical marijuana businesses and religiously related activities, licensed daycares, and recreational areas for children and changing the designated municipal safe zones from 500 to 1,000 feet. *Id.* Mr. Weaver alleges that his medical marijuana business is the only one affected by these amendments. *Id.*

At the May 8 meeting, Mr. Miller admitted there was no safety concern justifying the extension of the safe zone from 500 to 1,000 feet.

On June 8, 2021, voters approved the warrant articles.  *Id.* ¶ 70.

## J.    The Second Amended Complaint

Mr. Light's Second Amended Complaint states four causes of action.  Count I is a petition for judicial review of the June 8, 2021, ordinance amendment pursuant to Maine Rule of Civil Procedure 80B.  *Id.* ¶ 71.  Count II is a 42 U.S.C. § 1983 claim for violation of Mr. Weaver's equal protection and due process rights based on the Town "previously falsely approv[ing] and indicat[ing] to [him] that his business was licensed." *Id.* ¶ 75.

Mr. Light also alleges that because Mr. Weaver "suffer[ed] from debilitating health conditions that restrict his vocal cords and interfere with his speech" he "faced significant hurdles in communicating with Livermore regarding its medical marijuana ordinance."  *Id.* ¶ 77.  He moreover alleges that the Board members "harbored . . . biases" and "continue to subject [Mr. Weaver] and his business to constant risk of civil violation and/or enhancement of any criminal violations within the federal criminal code, particular as it pertains to the designation of a safe zone within the area of [his] business operation."  *Id.* ¶¶ 78-79.  In Count III, Mr. Light alleges that the Planning Board "participated in an unlawful, unnoticed non-public deliberative meeting" in violation of Maine's Freedom of Access Act.  *Id.* ¶ 88.  In Count IV, Mr. Light seeks a declaratory judgment that "Livermore's actions in attempting to enact its marijuana ordinance and subsequently amending that ordinance did not comport with Maine statute or Livermore's own ordinances" and

that "the Town . . . failed to issue the approved licensure or authorization to operate as a retail medical marijuana business." *Id.* ¶¶ 90, 96.

## III.   THE PARTIES' ARGUMENTS

### A.   The Defendants' Motions to Dismiss[2]

#### 1.   Count I

The Defendants argue that Count I, which requests judicial review of the ordinance amendment pursuant to Maine Rule of Civil Procedure 80B, should be dismissed "because it is untimely and because it fails to state a claim upon which relief can be granted." *Defs.' Mot.* at 3.  They say that "[u]nder Rule 80B, the initial issue in any case is whether the court has the power to review the matter complained of," *id.* at 4 (citing 3 Field, McKusick & Wroth, *Maine Civil Practice* § 80B:1 (3d ed.)), and that "Law Court precedent makes clear that this is not the kind of action that is subject to review under Rule 80B." *Id.*  Citing *F.S. Plummer Co. v. Town of Cape Elizabeth*, 612 A.2d 856 (Me. 1992), the Defendants argue that "review pursuant to 80B [is] not available where 'the Town Council was performing a legislative function, as opposed to an administrative or quasi-judicial function.'" *Id.* (quoting *F.S. Plummer Co.*, 612 A.2d at 859).  They say that Mr. Weaver cannot invoke Rule 80B review where he "similarly challenges a legislative action taken by the voters of the Town of Livermore: the approval of the amendments to the medical marijuana ordinance." *Id.*

---

[2]     The Court will discuss both the Defendants' initial motion to dismiss the first three counts of the complaint, *Defs.' Mot.*, and the Defendants' later motion to dismiss Count IV.  *Defs. Count IV Mot.* (collectively The Defendants' Motions to Dismiss).

The Defendants also argue that "to the extent Plaintiff intends for Count I to encompass other actions alleged in the Amended Complaint, such challenges are barred by the applicable statute of limitations," which requires that "a complaint seeking review of governmental action under Rule 80B . . . be filed 'within 30 days after notice of any action or refusal to act' . . . or, for a failure to act, 'within six months.'"  *Id.* at 5.  They say that "[t]he allegations in the Amended Complaint describe various actions that were taken by the Town in 2019 and 2020," but Mr. Weaver "commenced the instant case on July 8, 2021 . . . long after the applicable 30-day statute of limitations for challenging those actions had elapsed."  *Id.*

### 2.   Count II

#### a.   Claims Against the Town of Livermore

As to Count II, Mr. Weaver's claim for violations of the Fourteenth Amendment of the United States Constitution and the provisions of the Maine Constitution and a Maine statute, the Defendants assert that "[b]ecause [42 U.S.C.] § 1983 affords a right of action only for violations of the U.S. Constitution or federal law, Count II fails to state a claim to the extent it is premised on violations of the Maine Constitution or Maine statute."  *Id.* at 5.

With respect to Mr. Weaver's federal claims against the town of Livermore, the Defendants argue that a municipality cannot be held liable under a theory of respondeat superior, and that Mr. Weaver must surmount "a very high bar" to establish the Town's liability with proof "that an employee's 'action pursuant to official municipal policy' caused [his] injury."  *Id.* at 6 (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).  Pursuant to this standard, the Defendants submit that Mr.

Weaver "fails to allege facts that plausibly show that any injury to Plaintiff was caused by a 'policy or custom' of the Town," the "Amended Complaint is bereft of any facts that actually describe a policy or custom[,]" and "the complained-of conduct arose from personal disputes between Plaintiff and various individuals with undefined roles." *Id.* at 6-7.

As to Mr. Weaver's Equal Protection claim against the Town, the Defendants argue that Mr. Weaver cannot make out his "class of one" claim, which requires him to "show an extremely high degree of similarity between [himself] and the persons to whom [he] compare[s] [himself]." *Id.* at 7 (quoting *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007)). They further contend that "the First Circuit has cautioned that 'only in extreme circumstances will a land-use dispute give rise to an equal protection claim.'" *Id.* at 7-8 (quoting *Torromeo v. Town of Fremont*, 438 F.3d 113, 118 (1st Cir. 2006)). The Defendants say that Mr. Weaver only points to one other business—Inside Out Indoor Garden Supply—but that "[a] garden supply store . . . plainly is not 'situated similarly in all relevant aspects' to a marijuana retail store." *Id.* at 8 (quoting *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006)). Finally, they submit that "[t]o the extent [Mr. Weaver's] equal protection claim is premised on the Town's use of Zoom meetings during the COVID-19 pandemic . . . the Amended Complaint fails to allege that the Town treated similarly situated individuals with disabilities differently that it treated Plaintiff." *Id.*

Regarding Mr. Weaver's Due Process claim against the Town, the Defendants explain that Mr. Weaver has a limited ability to recover following the denial of a

license and the facts here do not rise to "level of conscience shocking." *Id.* at 9. They say that Mr. Weaver has only alleged "procedural irregularities" and that Board members were "hostile, abrasive, intimidating and rude," which is not "governmental action that shocks the conscience." *Id.* (quoting *Lambert v. Fiorentini*, 949 F.3d 22, 28 (1st Cir. 2020)). The Town further argues that Mr. Weaver has not specifically alleged a deprivation of a "life, liberty, or property interest" and thus his due process claim fails at the first step. *Id.* at 10 (citing *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011)).

### b.   Claims Against Individual Defendants

The individual defendants assert that "[t]he Amended Complaint plainly fails to state a plausible § 1983 claim against" Mr. Miller, Mr. Chretien, Mr. Deyling, Mr. Richmond, Mr. Guild, Mr. Martin, and Mr. Berry because Mr. Weaver "fails to allege that any of those individuals are employees or officials of the Town" and the "fact that an individual lives in a town is not a sufficient basis for *any* liability." *Id.* at 12 (emphasis in original).

They further argue that even though Ms. Byron is a Town official and Mr. Manter and Ms. Perkins are identified members of the Planning Board, the allegations regarding their conduct are "sparse at best." *Id.* at 13. In particular, the Defendants contend that there are no facts stating that Ms. Byron, Mr. Manter, or Ms. Perkins "singled Plaintiff out and treated him differently than another individual or business" or that they deprived him of a liberty or property interest. *Id.*

Regardless, the individual defendants invoke qualified immunity and submit that under the two-part test for qualified immunity, "the Amended Complaint plainly

fail[s] to make out a plausible claim that any of the Individual Defendants violated Plaintiff's constitutional rights." *Id.* at 13-14.  They further argue that "the alleged due process and equal protection rights certainly were not 'clearly established' at the time of the alleged violations." *Id.* at 14.

Finally, the Defendants urge the Court to dismiss Count II because Rule 80B provides the exclusive means for judicial review and Mr. Weaver cannot pursue § 1983 claims when such other adequate forms of redress are available. *Id.* at 14-15. They note that Mr. Weaver has already filed a Rule 80B appeal which is pending in the Maine Superior Court and that pursuant to the exclusivity principle, Count II should be dismissed. *Id.* at 15-16.

### 3.    Count III

The Defendants also argue that Mr. Weaver's third count—alleging a FOAA violation—should be dismissed as untimely, because FOAA claims must be brought within 30 days of the alleged violation. *Id.* at 16.  The Defendants also contend that "the relief Plaintiff seeks in Count III is not available to him as a private individual" as only the Attorney General may enforce FOAA fines pursuant to 1 M.R.S. § 410. *Id.* at 17.

### 4.    Count IV

Finally, the Defendants contend that the Plaintiff's fourth count—seeking a declaratory judgment that the Town did not comply with Maine statute and its own ordinances in enacting and amending the marijuana ordinance, and that it improperly failed to issue Mr. Weaver a license—should also be dismissed for failing to state a claim upon which relief can be granted. *Defs.' Count IV Mot.* at 6.

18

Regarding the ordinance, they argue that "lack of strict compliance with the statute is not sufficient to invalidate an ordinance based on enactment procedure grounds" and instead "substantial compliance with the statutory provisions is sufficient." *Id.* at 3 (citing *Crosby v. Inhabitants of Town of Ogunquit*, 468 A.2d 996, 998 (Me. 1983)). Because "it is clear that the Town substantially complied with the provision," specifically by providing enough notice that inhabitants could "tally an informed vote," the Defendants assert that the Plaintiff has no viable claim for a declaratory judgment that the ordinance is invalid. *Id.* at 3-4.

As to the Plaintiff's claim regarding the refusal to issue him a license, the Defendants claim that "Plaintiff is attempting to dress up as a declaratory judgment claim an issue that *is* subject to [Rule] 80B: the issue of permitting and/or licensing." *Id.* at 4 (emphasis in original).   Under Rule 80B, a party must challenge a municipality's failure to act "within six months after expiration of the time in which action should reasonably have occurred" and "a declaratory judgment action cannot be used to revive a cause of action that is otherwise barred by the passage of time." *Id.* (first citing ME. R. CIV. P. 80B and then citing *Sold, Inc. v. Town of Gorham*, 2005 ME 24, ¶ 10 868 A.2d 172).   The Defendants contend that "[u]nder any concept of when the Town should have acted . . . filing the Complaint almost twelve months after the demand for the Town to act falls well outside of when action by the Town 'should reasonably have occurred' in response to Weaver's attorney's demand" and thus "Plaintiff cannot dress up this alleged failure by a municipal actor to act as a

declaratory judgment claim to circumvent the timeliness confines of Rule 80B." *Id.* at 5.

**B.    Michael Weaver's Opposition**

**1.    Count I**

Mr. Weaver first notes that there is a Rule 80B and declaratory judgment action pending in state of Maine Superior Court, but the matter has been stayed pending resolution of the motion to dismiss before this Court. *Pl.'s Opp'n* at 11. He reasons that 22 M.R.S. § 2429-D(2) "appears to provide for direct review of municipal actions that run afoul of this provision." *Id.* at 12.

**2.    Count II**

Regarding his equal protection claim, Mr. Weaver says that the defendants have "conflate[d]" his "two independent equal protection arguments" and that he alleges both a class of one claim and a disability discrimination claim. *Id.* at 13. He argues that the Defendants' characterization of his comparator as a "garden supply shop" is "a wholly arbitrary one, as that entity sought the very same license . . . for the very same purpose for retail sales of medical marijuana." *Id.* at 13-14. Mr. Weaver submits that "[e]xact [comparator] correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Id.* at 14 (quoting *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 34 (1st Cir. 2008)). He says that the Defendants ignore the primary similarity in that "they were [both] applying for the same licensure." *Id.*

As to his disability discrimination claim, Mr. Weaver says that "[n]o other individual who received a medical marijuana business license was treated with such

utter disrespect and hostility or was precluded from participating in the process because of their difficulties breathing and speaking [that] made them difficult to understand." *Id.* at 15. He says that all he must show is that "the parties with whom [he should] be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." *Id.* (quoting *Cordi-Allen*, 494 F.3d at 251) (alteration in *Pl.'s Opp'n*).

As to his procedural due process rights, Mr. Weaver says that "both a liberty and a property interest are implicated." *Id.* He argues that "because federal law still treats marijuana as an illegal substance, placing [him] in a safe zone could have extreme implications with respect to penalties should the Federal Government resume enforcement of its Federal Criminal law." *Id.* He also says that "Maine law treats professional business[] licenses as property rights" and his license should be treated the same. *Id.* at 16 (citing *Balian v. Bd. of Licensure in Med.*, 772 A.2d 364 (Me. 1999)).

Mr. Weaver insists he has pleaded a conscience-shocking substantive due process claim and that "intent to injure one in particular person is present here" because the "Defendants misled [him] about his ability to apply for a license, orchestrated a fraudulent meeting utilizing the wrong procedure . . . then subsequently failed to provide the licensure just long enough that it could enact an ordinance target[ed] at harming [him]." *Id.* at 16.

Regarding the Town's liability, Mr. Weaver says that "Livermore is liable under *Monell*, because the actions taken that deprived [him] of his constitutional rights were taken by those with primary policymaking authority." *Id.* at 17. He also says that "the Town is liable because their pattern of treatment . . . was not the consequence of one single action by one single municipal official, but rather a cohesive pattern involving intersecting public officials all with separate but significant policy making authority." *Id.*

As to the Individual Defendants, Mr. Weaver says that the Defendants' arguments are "technical" and "easily resolved by clarification pursuant to" Federal Rule of Civil Procedure 15(a) because the named individuals are the current or former Town Administrator, Planning Board Members, or Selectboard Members. *Id.* To the Individual Defendants' qualified immunity, Mr. Weaver emphasizes that "[q]ualified immunity is an affirmative defense" and that "[d]ismissing a case under Rule 12(b)(6) on the basis of an affirmative defense requires that (i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *Id.* at 18 (quoting *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006)). Mr. Weaver asserts "[t]hat's just not the case here" because "[t]he protections afforded caregivers in Maine . . . [and] the bulk of cases cited[,] . . . particularly *Olech* and *SBT Holdings*, . . . establish Defendants' actions as unconstitutional and unlawful." *Id.* at 18.

Concerning the exclusivity principle, Mr. Weaver argues that the Defendants' argument on this point contradicts their argument that Rule 80B does not apply to his suit. *Id.* at 18. Moreover, he argues that the Law Court has articulated three exceptions to this principle, and he meets all three. *Id.*

### 3.   Count III

Finally, Mr. Weaver argues that the Defendants' FOAA timeliness argument fails because "the fact that the meeting occurred did not become known to [him] until the Town made a . . . FOAA production which included the email meeting." *Id.* at 19. As a result, Mr. Weaver says, "it would be appropriate to toll" the thirty-day limitations period until after he learned of the meeting. *Id.* As to the relief requested, Mr. Weaver "acknowledges that only the Attorney General may assess civil penalties" but submits that "other relief including attorneys' fees and litigation expenses most certainly are available to [him] for bringing this action." *Id.* at 20.

### 4.   Count IV

Mr. Weaver did not file a response motion opposing the Defendants' motion to dismiss Count IV before the deadline date of August 18, 2022.

### C.   The Defendants' Reply

In reply the Defendants argue that Mr. Weaver "does not meaningfully respond" to their "argument that enactment of the ordinance is a legislative function for which 80B review is not appropriate." *Defs.' Reply* at 1. They further reject Mr. Weaver's reliance on 22 M.R.S. § 2429-D(2) because "[n]othing in that provision indicates that such review is available." *Id.* at 2.

Regarding the Town's liability, the Defendants reject Mr. Weaver's argument that "the Town is liable because the individuals whom he alleges violated his constitutional rights are policymakers." *Id.* at 4. Accordingly, the Defendants disagree with Mr. Weaver that "Town officials' failure to follow the Town's rules and procedures provide[s] grounds for holding the Town liable." *Id.* (citing *Abdisamad v. City of Lewiston*, 960 F.3d 56, 61 (1st Cir. 2020)).

As to the Individual Defendants, the Defendants argue that "[a]lthough inferences are drawn in the plaintiff's favor at the motion to dismiss stage . . . there [still] must be well-pled facts from which those inferences may be drawn." *Id.* at 5.

Regarding exclusivity, the Defendants reject Mr. Weaver's assertion that their "exclusivity argument contradicts their argument that Rule 80B does not apply to the ordinance amendment." *Id.* The Defendants say that "Count I is explicitly limited to challenging the amendment of the medical marijuana ordinance . . . which is not subject to Rule 80B review" and that "[t]he procedural irregularities of which Plaintiff complains in Count II are precisely the kind of governmental action for which review under 80B *is* available and adequate." *Id.* (emphasis in original).

In response to Mr. Weaver's equal protection arguments, the Defendants reject the notion that Inside Out Indoor Garden Supply is a sufficient comparator because it sought the same license, because the Amended Complaint sets forth no such allegation and moreover, Inside Out is not similarly situated. *Id.* at 6. Regarding Mr. Weaver's disability discrimination claims, the Defendants contend that individuals with disabilities "are not a suspect class for equal protection purposes"

24

and thus this equal protection claim is subject to rational basis review. *Id.* (quoting *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006)). They disagree that Mr. Weaver can present individuals without disabilities as proper comparators, rather than evidence that the Defendants treated another similarly situated individual with a disability differently than Mr. Weaver. *Id.* Finally, regarding Mr. Weaver's due process claims, the Defendants reject the contention that Mr. Weaver is "protected from municipal regulation by state statute" and that he was deprived of a state-issued caregiver license. *Id.* They also reject that any of the alleged conduct is "conscious-shocking." *Id.* at 7.

As to Count III, the Defendants reiterate the same arguments proffered in their initial motion to dismiss. *Id.*

## IV.   LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'"

25

*Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)).  This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'"  *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis."  *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.   DISCUSSION

### A.   Mootness & Standing

To begin, the Court addresses the Defendants' arguments, raised in their objection to the Plaintiff's motion to amend, *see Defs.' Opp'n to Pl.'s Mot. for Leave to File Second Am. Compl.* (ECF No. 26), that the entire case is now moot because the Court cannot grant Mr. Light any effective relief and he fails to allege an ongoing injury to the Estate.  *Id.* at 3, 6.  In response, Mr. Light asserts that the case is not

moot because "[w]hether a medical marijuana retail store can be operated at that building is certainly very much a germane question to the Estate, and very much remains a meaningful question for those who will obtain the asset." *Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Leave to File Second. Am. Compl.* (ECF No. 27).

It is a bedrock principle that "in a federal court, justiciability requires the existence of an actual case or controversy," a "requirement that persists at all stages of the litigation and not merely at the time suit is instituted." *Goodwin v. C.N.J.*, 436 F.3d 44, 48 (1st Cir. 2006) (citing U.S. CONST. art. III, § 2, cl.1). The "case or controversy" requirement limitation "underlies the standing doctrine, which is designed to assure that issues are presented to the court 'in the context of a specific live grievance.'" *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1374 (1st Cir. 1992) (quoting *Golden v. Zwickler*, 394 U.S. 103, 110 (1969)). Generally, standing is a threshold question, *id.*, but "[w]hether subsequent events have dissipated the plaintiff's interest is assessed through the prism of mootness."[3] *Goodwin*, 436 F.3d at 48 (citing *Becker v. FEC*, 230 F.3d 381, 386 n.3 (1st Cir. 2000)). "A case becomes moot if, at some time after the institution of the action, the parties no longer have a legally cognizable stake in the outcome. *Id.* (citing *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). Whether a plaintiff's demise renders a claim moot depends, in part, on the type of relief sought and the harm alleged.

---

[3]     "Mootness is closely related to standing . . . ." *In re O'Niel*, No. EB 20-023, 2021 Bankr. LEXIS 1467, at *8 (Bankr. 1st Cir. May 21, 2021) (quoting *Horizon Bank & Tr. Co. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004)). "The Supreme Court has described mootness as 'the doctrine of standing in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)).

### 1.     Injunctive Relief

In Count I, the Plaintiff requests that the Court "enjoin the Town of Livermore from enforcing [the ordinance] amendments," and in Count II, he requests "an injunction on the Town of Livermore's enforcement of its unconstitutional ordinance and amendments to said ordinance." *Second Am. Compl.* ¶¶ 71, 85. "To have standing to obtain injunctive relief, a party must show that it faces some prospect of future harm." *Old Town Util. v. Tech. Park, LLC v. Consol Edison, Sols., LLC*, No. 2:190cv000029-JDL, 2019 U.S. Dist. LEXIS 168043, at *43 (D. Me. Sept. 30, 2019) (citing *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004)). "[P]ast exposure to harm will not, in and of itself, confer standing upon a litigant to obtain equitable relief '[a]bsent a sufficient likelihood that he will again be wronged in a similar way.'" *Id.* (quoting *Frank*, 968 F.2d at 1376). Here, the Court concludes that Mr. Weaver's original claims for injunctive relief are moot because, even though Mr. Light requests that the Court enjoin the ordinance and amendment, rather than require the Town to grant him a retail license, Mr. Light has not demonstrated that the Estate would benefit from the requested relief, or that the Estate is likely to be harmed by similar conduct in the future.

In determining whether a representative of a deceased plaintiff's estate may continue with the decedent's claim for injunctive relief courts look at whether the decedent's estate could benefit from the relief and whether the estate is likely to experience the same or similar harm as the original plaintiff in the future. For example in *Goodwin v. C.N.J, Inc.*, the First Circuit dismissed a claim for injunctive relief as moot where the deceased plaintiff originally requested "equitable relief in

28

the form of an order directing the defendants to provide the plaintiff with future installation work under reasonable terms consistent with those given to other experienced carpet installers." 436 F.3d at 48. The First Circuit explained that the decedent's estate could not "conceivably benefit from such an order" in the Plaintiff's favor nor could the "Executrix who [was] merely administering [the decedent's] estate and not carrying out [the decedent's] business." *Id.* The *Goodwin* Court concluded that "because [the decedent's] death divests an injunction to bar future acts of discrimination of all utility, such an injunction cannot issue" especially because "intervening events eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm." *Id.* at 48-49.

Applying standing doctrine, courts have also looked to whether there is continued harm after the decedent's death. In *Plumley v. Landmark Chevrolet*, 122 F.3d 308 (5th Cir. 1997), the court dismissed an ADA claim alleging that the defendant illegally repudiated a truck contract when the defendant discovered that the plaintiff was HIV-positive. *Id.* at 309. The court ultimately dismissed a claim for injunctive relief because the substituted plaintiff could not "show that there [was] a real or immediate threat that he [would] be wronged again" because the plaintiff had died, and the decedent's son had purchased another truck. *Id.* at 312; *see also Goodwin*, 436 F.3d at 49 (citing *Plumley* as an example of the "impeccable line of authority" supporting the conclusion that a plaintiff's death moots a claim for injunctive relief).

Similarly, in *Blake v. Southcoast Health System, Inc.*, 145 F. Supp. 2d 126 (D. Mass. 2001), the United States District Court for the District of Massachusetts concluded that the estate of a deceased patient could not recover for injunctive relief under the ADA against a hospital because the original plaintiff was deceased and thus could not be harmed further by the defendants. *Id.* at 136. The district court explained that "although equitable relief could be fashioned that would prevent discrimination against other mentally disabled individuals, this Court has no constitutional authority to grant the Estate such relief." *Id.* at 136-37; *see also Belvedere v. Magi Enters*, No. 3:06 CV 1595, 2007 U.S. Dist. LEXIS 13582, at *10 (N.D. Ohio Feb 28, 2007) (dismissing the plaintiff's claim for lack of standing following the original plaintiff's death because the substituted plaintiff failed to assert ongoing discrimination by the defendant or allege that he would use the defendants' facility in the future); *Gant v. Bowles*, No. 3:05-0949, 2005 U.S. Dist. LEXIS 44462, at *3-4 (M.D. Tenn. Nov. 3, 2005) ("Here the real party in interest is the deceased . . . not the plaintiff. The plaintiff has not established, nor can it be liberally construed from the complaint that, apart from being the deceased's brother, the plaintiff is suing on behalf of the estate of the deceased or that he otherwise has standing to bring this action. Neither has the plaintiff alleged an injury sufficient to meet the 'case or controversy' requirement of Article III, or that he would even benefit from asserting the rights of the deceased").

Applying these standing principles to the facts in this case, the Court concludes that Mr. Light does not have standing to recover for injunctive relief, and now that

Mr. Weaver is deceased, Mr. Light's request for the Court to enjoin the ordinance and the amendment is moot.

This point is best illustrated by examining the developments in this case and using a simple example. When Mr. Weaver filed the Complaint, he properly alleged that "Plaintiff is a licensed medical marijuana caregiver." *State Ct. R.*, Attach. 1, *Compl.* ¶ 12. After Mr. Weaver passed away, on July 6, 2022, Mr. Light as the personal representative of Mr. Weaver's Estate, moved to be substituted as Plaintiff, *Mot. to Substitute* at 1, and the Court granted the motion the same day, requiring Mr. Light to file a motion to amend the First Amended Complaint. *Substitution Order*. On July 26, 2022, Mr. Light moved to amend the First Amended Complaint, *Mot. to Am.*, but Livermore objected, in part because Mr. Light as personal representative of the Estate of Michael Weaver did not have standing to bring the claims in the Second Amended Complaint. *Defs.' Opp'n to Pl.'s Mot. for Leave to File Second Am. Compl.* at 1-10 (ECF No. 26). The Court allowed the filing of the amended complaint, reserving the standing argument for the motion to dismiss. *Order on Mot. to Am.* at 1-8. On August 8, 2022, Mr. Light filed his Second Amended Complaint. *Second Am. Compl.*

Although aware of Livermore's argument that as personal representative, he no longer had standing to make the claims in the Second Amended Complaint, Mr. Light simply altered the verb tenses on critical allegations. Thus, he now alleges that

"Plaintiff was a licensed medical marijuana caregiver."[4] *Second Am. Compl.* ¶ 15.  As currently framed, there are two issues with this allegation.  The first is that, even assuming the allegation is accurate, the fact that the Plaintiff was at one time a licensed medical marijuana caregiver would not entitle him to the current or prospective relief the Second Amended Complaint demands.

But the second, more significant problem is that it is not legally correct.  As of the order substituting Mr. Light for Mr. Weaver, the Plaintiff in the case is not Michael Weaver, who had been a licensed medical marijuana caregiver, but is Richard Light acting as personal representative of Michael Weaver's Estate, who had not been.  Richard Light as the personal representative of the Estate of Michael Weaver could not have held Mr. Weaver's license because the Estate was created only on Mr. Weaver's death, and Mr. Light does not allege (nor could he allege) that the medical marijuana caregiver license was issued to Mr. Light or was transferable to an estate upon the caregiver's death.  Thus, as the Court will further describe, the allegation that the "Plaintiff was a licensed medical marijuana caregiver" is erroneous as a matter of law.  The Plaintiff, namely the Estate, was never a licensed medical marijuana caregiver, and is not one now.   Because this allegation and others that are based on this allegation are erroneous as a matter of law, the Court is not required to accept them, even on a motion to dismiss.  *García-Catalán*, 734 F.3d at

---

[4]       The term, "licensed medical marijuana caregiver", which appears in the Plaintiff's pleadings, does not appear in the Maine Medical Use of Marijuana Act, 22 M.R.S. §§ 2421-2430-H.  The statutory term is "registered caregiver."  22 M.R.S. § 2422(11).  But the distinction between registration and license does not seem to make a difference.

103 ("conclusory legal allegations . . . need not be credited") (quoting *Morales-Cruz*, 676 F.3d at 224).

First, although Mr. Weaver—and Mr. Light—at no point requested that the Court order the town of Livermore to grant a retail marijuana license, neither the Estate nor Mr. Light could "conceivably benefit from" a court order enjoining the ordinance or the amendment. As in *Goodwin*, Mr. Light as the representative of Mr. Weaver's Estate has not alleged that he intends to carry on Mr. Weaver's business. What is more, even if he intends to do so, Mr. Light has not alleged that he as personal representative or the Estate, would be legally authorized to do so.

The state of Maine has enacted the Maine Medical Use of Marijuana Act (MMUMA). 22 M.R.S. § 2421; §§ 2421-2430-H. The MMUMA defines "caregiver" as "a person or an assistant of that person that provides care for a qualifying patient." 22 M.R.S. § 2422(8-A). A "registered caregiver" is a "caregiver who is registered by the [Department of Administrative and Financial Services] pursuant to section 2425-A." 22 M.R.S. §§ 2422(11), (2-A). Section 2425-A mandates that a caregiver must obtain a "registry identification card".[5]  To qualify, the caregiver must undergo "a criminal history record[s] check". 22 M.R.S. § 2425-A(3). Under section 2423-A(2), a "caregiver" must be "a resident of the State [of Maine]," must be "21 years of age or older," and must not have been convicted of a "disqualifying drug offense." 22 M.R.S. § 2423-A(2). Once approved, the MMUMA authorizes the registered caregiver to

---

[5]    Section 2423-A contains an exception to the registry identification card requirement not relevant here. *See* 22 M.R.S. § 2423-A(3)(C)(1-3) (addressing situations involving members of the same family).

perform several tasks involving marijuana, ranging from cultivation to assisting a qualifying patient in its use. 22 M.R.S. § 2423-A(2)(A-Q). The MMUMA authorizes a registered caregiver to operate "one caregiver retail store to sell harvested marijuana to qualifying patients for the patients' medical use in accordance with this chapter." 22 M.R.S. § 2423-A(2)(P). The MMUMA allows a registered caregiver to "[b]e organized as any type of business entity recognized under the laws of the State." 22 M.R.S. § 2423-A(2)(Q). There is no allegation in the Second Amended Complaint that Mr. Weaver was conducting his registered caregiver activity as a business entity. Furthermore, Mr. Light makes no allegation that Mr. Weaver's registered caregiver status survived Mr. Weaver's death or was transferred or even transferrable to Mr. Light as personal representative of Mr. Weaver's estate.

The MMUMA allows municipalities to regulate "registered caregivers" and "caregiver retail stores" consistent with their home rule authority granted by the Maine Constitution. 22 M.R.S. § 2429-D. But the MMUMA prohibits municipalities from restricting the number of registered caregivers, forbids municipalities from prohibiting caregiver retail stores operating with municipal approval as of the effective date of the MMUMA, and allows municipalities to adopt an ordinance or approve a warrant authorizing caregiver retail stores not operating as of the effective date of the MMUMA. 22 M.R.S. § 2429-D(2-3).

The Department of Administrative and Financial Services promulgated regulations that establish criteria for an applicant. *See* Code of Me. Rules 18-691, ch. 2. Maine has adopted a seventeen-step process that requires applicants to provide

their social security numbers, state of Maine-issued ID information, and state of Maine issued Sales Tax ID Numbers, indicate whether they have been convicted of a violation of state or federal controlled substances law, and go through a comprehensive background check.  Dep't of Admin. and Fin. Servs.: Off. of Cannabis Pol'y, *Caregiver Online Application Instructions*, https://www.maine.gov/dafs/ocp/medical-use/applications-forms/caregiver-instructions (last visited Aug. 8, 2022).  In other words, whether a person may become a registered caregiver, and subsequently operate a licensed retail store, depends on the individual's application.

Even assuming that the Court enjoined enforcement of the ordinance or the amendment or declared either of them unconstitutional, Mr. Light has not alleged that he as personal representative or the Estate is a registered caregiver or would be eligible for, or even be able to apply for, a marijuana retail license absent the ordinance or amendment.  Mr. Weaver's eligibility for the retail license was in part based on the fact that he was a registered caregiver, a threshold requirement that Mr. Light has not alleged on behalf of himself or the Estate.  Thus, neither would be able to benefit from the injunction of the ordinance or amendment because neither the Estate nor Mr. Light would be able to operate as a medical marijuana retail store even assuming the ordinance was not in place.  *See ACLU of Mass. v. United States Conf. of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013) ("A second and independent reason for mootness is that a court cannot provide meaningful relief to the allegedly aggrieved party.  This is clearest in cases where the only relief requested is an

35

injunction"). In the absence of allegations that Mr. Light or the Estate is legally registered as a caregiver to carry on Mr. Weaver's business, enjoining the ordinance to allow issuance of a retail license would confer no benefit on either Mr. Light or the Estate because neither has met the underling requirements for licensure.

Second, because Mr. Weaver is now deceased there is no "reasonable anticipation that [Mr. Weaver] will, in the future be faced with a recurrence of the alleged harm." *Goodwin*, 436 F.3d at 48-49.

Third, in its absence, Mr. Light failed to allege an ongoing injury or harm resulting from the ordinance or amendment now that the original harm to Mr. Weaver has ceased. Although Mr. Light asserts that whether the building can be used as a retail medical marijuana store is pertinent to those who will ultimately receive the building as part of the Estate, Mr. Light has not alleged a specific harm to the estate or to himself resulting from the ordinance or amendment; any assertions that the property will be used as a medical marijuana retail store in the future are speculative at best. Mr. Light fails to show that either he or another specific beneficiary will not only receive Mr. Weaver's property but is already licensed as a caregiver and has applied, or will apply, for a retail license for Mr. Weaver's Livermore property. Furthermore, if a future registered caregiver were stymied by the town of Livermore's ordinances, the right to bring a legal action would rest with that caregiver.

In sum, Mr. Light, as representative of Mr. Weaver's estate, cannot obtain injunctive relief because the estate would not benefit from an injunction of the

ordinance, because neither Mr. Light nor the Estate is a registered caregiver in the state of Maine eligible for a retail license.  Furthermore, because Mr. Weaver is deceased, any direct harm to him has ended, and Mr. Light has not alleged that the Estate will be harmed by the ordinance or the amendment in the future.  Mr. Light does not have standing[6] to pursue injunctive relief.

### 2.    Declaratory Judgment

In Count IV of his Second Amended Complaint, Mr. Light seeks a declaratory judgment that the original ordinance and ordinance amendments were not properly enacted and the Town violated municipal and state law when it failed to grant Mr. Weaver a retail license.  *See Second Am. Compl.* ¶ 96.  The Court notes at the outset that Mr. Light did not file a timely opposition to the Defendants' motion to dismiss Count IV.  *See Order re Mot. to Dismiss for Failure to State a Claim - Count IV of Second Am. Compl.* (ECF No. 32) (ordering Mr. Light to respond by August 18, 2022). By failing to respond, Mr. Light has waived the right to object to that portion of the Defendants' motions to dismiss, and thus the Court will dismiss Count IV as procedurally defaulted.  *See Andrews v. Am. Red Cross Blood Servs.*, 251 F. Supp. 2d 976, 979 (D. Me. 2003) ("Failure to respond to a motion to dismiss means that opposition to the motion is waived . . . and the motion may be granted for that reason alone"); *see also Lowe v. Mills*, No. 1:21-CV-00242-JDL, 2022 WL 3542187, at *6 (D. Me. Aug. 18, 2022) ("Because the Plaintiffs failed to oppose the . . . motion to dismiss,

---

[6]     The Court will not become enmeshed in whether Mr. Light lacks standing because when he entered the case, he did not have the requisite legal interest to make this claim or whether Mr. Weaver's case has become moot because he passed away and thereby, he lost the requisite legal interest to make the claim.  Under either precept, the suit may not be maintained.

[the Court] treat[s] the affected claims as abandoned"); *Putney, Inc. v. Pfizer, Inc.*, No. 07-108-P-H, 2007 WL 3047159, at *8 (D. Me. Oct. 17, 2007) (explaining that, because the non-moving party failed to respond to arguments raised in the motion to dismiss, "the motion to dismiss may be granted for that reason alone").   Although the procedural default alone constitutes sufficient grounds for dismissal, the Court proceeds to conclude that Mr. Light's declaratory judgment claims—even absent the procedural default—are moot and thus Count IV would be dismissed regardless.

"For declaratory relief to withstand a mootness challenge, the facts alleged must 'show that there is a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *ACLU of Mass.*, 705 F.3d at 53-54 (emphasis omitted).   "Issuance of a declaratory judgment deeming past conduct illegal is also not permissible" where "it would be merely advisory." *Id.; see Spencer v. Kemna*, 523 U.S. 1, 18 (1998) ("We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong"); *United States v. Reid*, 369 F.3d 619, 624 (2004) (dismissing the plaintiff case as moot because "[a]ny opinion on the merits of [the] appeal to this court would be merely advisory").

In determining whether a claim for a declaratory judgment may proceed in a case where the original plaintiff is deceased, courts look to whether an actual "case or controversy" exists and if the plaintiff could theoretically benefit from the declaration of the plaintiff's rights or the defendants' obligations. *See Harrow v. Prudential Ins. Co. of Am.*, 279 F. 3d 244, 249 (3d Cir. 2002); *Plumley*, 122 F.3d at

312 ("to obtain [declaratory relief] [the plaintiff] must show that an actual case or controversy . . . exists"); 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought"). The First Circuit has also differentiated between cases where the declaratory judgment "can . . . be used as a predicate to further relief," *Unión De Empleados De Muelles De P.R., Inc. v. Int'l Longhorsemen's Ass'n, AFL-CIO*, 884 F.3d 48, 59 (1st Cir. 2018) (quoting *Powell v. McCormack*, 295 U.S. 486, 499 (1969)), and cases where "the declaratory relief could not have been used prospectively by the [plaintiff] to protect its rights . . . and hence there was no ongoing controversy." *Id.* at 499 n.12 (collecting cases).

The Court concludes that Mr. Light's claim for a declaratory judgment is moot. Mr. Light, as representative of the Estate, would not benefit from a declaration that the Town violated state law or municipal law because he has not alleged that the Estate is a registered caregiver or could qualify as one. In the absence of any direct benefit to Mr. Light as the representative of the Estate, the Court's grant of a declaratory judgment would be merely advisory, which the Supreme Court and the First Circuit have expressly cautioned federal courts from doing. In addition to being procedurally defaulted, Mr. Light's claim for declaratory judgment is moot.

### 3.    Monetary Damages and Attorney's Fees

In Count II of the Second Amended Complaint, Mr. Light requests—in addition to injunctive relief—that the Court award compensatory damages, punitive damages and reasonable attorney's fees, *Second Am. Compl.* ¶ 85. In Count III, Mr. Light

"requests that the Court award Plaintiff reasonable attorney's fees and litigation expenses, and assess civil penalties as provided by 1 M.R.S. § 410." *Id.* ¶ 87. Although Mr. Light's claims for injunctive relief and declaratory judgment are now moot, his claim for monetary damages is not subject to the same bar. In *Goodwin* the First Circuit explained that "[a] finding of mootness with respect to a prayer for injunctive relief does not automatically render a companion claim for monetary damages moot" because "[t]ypically, a substituted plaintiff, such as a decedent's personal representative, has a legally cognizable interest in the recovery of money damages owed to the decedent's estate. 436 F.3d at 49 (citing *CONRAIL v. Darrone*, 465 U.S. 624, 630 (1984). Because Mr. Weaver originally requested compensatory and punitive damages, Mr. Light, as representative of Mr. Weaver's Estate, is entitled to any damages that may be awarded. As to attorney's fees, which Mr. Light requests as part of Counts II and III, the First Circuit has stated that "[a] litigant's interest in a possible award of attorney's fees is not enough to create a justiciable case or controversy if none exists on the merits of the underlying claim." *Id.* at 51. However, given that the Court has concluded that there is a justiciable issue as to monetary damages, the Court continues to the merits of Mr. Light's remaining claims.

### 4. Conclusion

In light of the Court's conclusion that Mr. Light's claim for injunctive relief is moot and his declaratory judgment claims are both procedurally defaulted and moot, the Court dismisses Mr. Light claims for injunctive relief in Counts I and II and dismisses Mr. Light's Count IV claim for declaratory judgment in its entirety. The

Court proceeds to the merits of Mr. Light's remaining claims under Counts I, II, and III.

### B.    Count I: Judicial Review Under Maine Rule of Civil Procedure 80B

Count I alleges that the Town's June 8, 2021, amendments to the marijuana ordinance were "affected by bias or error of law, [and] unsupported by substantial evidence on the whole." *Second Am. Compl.* ¶ 72.  Accordingly, Mr. Light seeks judicial review of the amendment pursuant to Maine Rule of Civil Procedure 80B.  *Id.* ¶¶ 71-72.

Maine Rule of Civil Procedure 80B provides that a plaintiff may appeal an "action or failure or refusal to act by a governmental agency" where "provided by statute" or "otherwise available by law."   M. R. CIV. P. 80B.   However, other independent claims do not trigger Rule 80B review.  *Nadeau v. Kempen*, No. 96-0012-B, 1996 U.S. Dist. LEXIS 11199, at *16-17 (D. Me. July 15, 1996) (citing *Int'l Paper Co. v. Town of Jay*, 665 A.2d 998, 1000 (Me. 1995)).

The Law Court has explained that "Rule 80B does not create judicial authority to review governmental action or inaction."  *F.S. Plummer Co.*, 612 A.2d at 859.  Rather "[t]he rule provides the *procedure* when governmental conduct is subject to direct judicial review by statute or when judicial intervention is otherwise available by law."  *Id.* (emphasis in original).  Maine courts have made clear that "[j]udicial review pursuant to Rule 80B is only available for administrative or quasi-judicial actions" and thus "not available for challenges to legislative actions by a governmental agency."  *City of Lewiston v. Androscoggin Cnty.*, No. AUBSC-CV-15-

118, 2016 Me. Super. LEXIS 44, at *12 (Me. Super. Ct. Mar. 18, 2016) (citing *F.S.
Plummer Co.*, 612 A.2d at 859). Such legislative decisions are "entitled to great
deference from the courts." *Bog Lake Co. v. Town of Northfield*, 2008 ME 37 ¶ 11,
942 A.2d 700. A plaintiff may challenge a legislative action by seeking a declaratory
judgment, although "that review [is limited] to a determination of whether the
ordinance itself is constitutional." *Id.* (citing *F.S. Plummer Co.*, 612 A.2d at 859).

Mr. Light notes that a Rule 80B appeal of the original ordinance, as well as a
declaratory judgment, are currently pending before the Androscoggin Superior Court,
and thus in this Court, he is solely challenging the amendment to the ordinance. *Pl.'s
Opp'n* at 11-12. In the Second Amended Complaint Mr. Light alleges that the Town's
amended marijuana ordinance went into effect after it was approved by voters on
June 8, 2021. *Second Am. Compl.* ¶ 70. The Law Court has consistently held that
enactment of an ordinance or amendment through the will of the voters constitutes a
legislative, rather than quasi-judicial, act. *See Bog Lake Co.*, 2008 ME 37 ¶ 11, 942
A.2d 700 ("When the voters of Northfield denied Bog Lake Company's request to
amend the shoreland area ordinance, they did so acting as the legislative body of the
Town"); *Vela v. Town of Camden*, 677 A.2d 1051, 1055 (Me. 1996) ("The voters at a
town meeting comprise the legislative body of the Town"); *see also Curnin v. Town of
Egremon*, 510 F.3d 24, at 29 (1st Cir. 2007) ("The registered voters who speak and
vote at Egremont's town meeting do so in their capacity as legislators"). Because the
amendment is a legislative act, Mr. Weaver may not challenge it by seeking judicial
review pursuant to Rule 80B. *See F.S. Plummer Co.*, 612 A.2d at 859 ("Because the

Town Council was performing a legislative function, as opposed to an administrative or quasi-judicial function, the court erred in undertaking a direct judicial review in the nature of an appeal. . ..."); *City of Lewiston*, 2016 Me. Super. LEXIS 44 at *12.

To the extent that Mr. Light alleges that the Court should reject the Defendants' argument that he cannot challenge the ordinance amendment through Rule 80B because the Maine Medical Use of Marijuana Act (MMUMA) "provide[s] for direct review of municipal actions that run afoul of this provision," *Pl.'s Opp'n* at 12, the Court rejects Mr. Light's argument.  Mr. Light specifically cites section 2429-D, which pertains to local medical marijuana regulations, as providing statutory authorization for judicial review under Rule 80B.  *Id.* (quoting *F.S. Plummer Co.*, 612 A.2d at 859).

However, as the Defendants note, the MMUMA does not address direct review of a local medical marijuana ordinance pursuant to Rule 80B.  *See* 22 M.R.S. § 2429-D; *Defs.' Reply* at 2.  The statute only sets forth that "[p]ursuant to home rule authority . . . a municipality may regulate registered caregivers, [and] caregiver retail stores" but may not "[p]rohibit or limit the number of registered caregivers; . . . [p]rohibit caregiver retail stores . . . that are operating with municipal approval in the municipality prior to the effective date of this section." § 2429-D(1)-(2).  However, municipal authorization is needed to "[a]uthorize caregiver retail stores . . . that are not operating on the effective date of this section to operate in the municipality unless the municipal legislative body . . . has voted to adopt or amend an ordinance or

approve a warrant article allowing caregiver retail stores . . . to operate within the municipality." *Id.* § 2429-D(3). The statutory provision is silent on judicial review.

Finally, even if the "otherwise available by law" provision of Rule 80B applied, Mr. Light's challenge to a legislative action is categorically ineligible for judicial review under Rule 80B. *Cf. La Bonta v. Waterville*, 528 A.2d 1262, 1263 (Me. 1987) (referencing the "otherwise available by law" provision as the "outer perimeter of Rule 80B" separate from an action for declaratory judgment). The Court concludes that judicial review of the ordinance amendment pursuant to Rule 80B is improper because passage of the amendment was a legislative action.

### C.    Count II: Constitutional Violations

#### 1.    Exclusivity

As a threshold matter, the Court addresses the Defendants' arguments that Count II should be dismissed because Rule 80B provides the exclusive means of reviewing Mr. Weaver's alleged constitutional violations and they may not be alleged as a separate § 1983 claim.

The exclusivity principle provides that:

> when a legislative body has made a provision, by the terms of a statute or an ordinance, for a direct means by which the decision of an administrative body can be reviewed in a manner to afford adequate remedy, such direct avenue is intended to be exclusive. Resort to the courts by alternative routes will not be tolerated, subject only to an exception for those circumstances in which the course of "direct appeal" review by a court is inadequate and court action restricting a party to it will cause that party irreparable injury.

*Fisher v. Dame*, 433 A.2d 366, 372 (Me. 1981); *see also Gorham v. Androscoggin Cnty.*, 2011 ME 63, ¶ 19, 21 A.3d 115. As noted above, Rule 80B "is a procedural rule that

governs the process for judicial review of municipal decisions in the Maine Superior Court." *Copp v. Shane*, No. 2:18-cv-00181-JAW, 2018 U.S. Dist. LEXIS 206973, at *52 (D. Me. Dec. 7, 2018) (quoting *Portland Cellular P'Ship v. Inhabitants of the Town of Cape Elizabeth*, No. 2:14-cv-00274-JDL, 2015 U.S. Dist. LEXIS 12255, at *2 (D. Me. Feb. 3, 2015)). However, "[r]eview pursuant to Rule 80B is inadequate when an alleged deprivation of civil rights occurs before, and not as a part of, the action or inaction for which a plaintiff seeks review." *Id.* (quoting *Cayer v. Town of Madawaska*, 2016 ME 143, ¶ 16, 148 A.3d 707).

In *McCarthy v. Inhabitants of the Town of Kennebunk*, No. 05-2-P-H, 2005 U.S. Dist. LEXIS 19724 (D. Me. Sept. 8, 2005) the District Court for the District of Maine did not resolve "whether the plaintiff's constitutional claims are barred by the existence of the Rule 80B remedy" but noted plaintiffs' tendency to join their Rule 80B and constitutional claims in a single action did "not mean that the exclusive means of enforcing constitutional rights in connection with an administrative proceeding before a municipal agency is found in Maine's Rule 80B." *Id.* at *18-20. The district court explained that in *Raskiewicz v. Town of New Boston*, the First Circuit stated that "where . . . the state offers a panoply of administrative and judicial remedies, litigants may not ordinarily obtain federal court review of local zoning and planning disputes by means of 42 U.S.C. § 1983." *Id.* at *18 (alteration in *McCarthy*) (quoting *Raskiewicz*, 754 F.2d 38, 44 (1st Cir. 1985)). The *McCarthy* Court emphasized that *Raskiewicz* "does not foreclose the plaintiff's constitutional claims

45

on the basis of the availability of the state-court Rule 80B remedy" nor does the Law Court's decision in *Fisher v. Dame*, 433 A.2d 366 (Me. 1981). *Id.* at *19-20.

Although the *McCarthy* Court concluded that *Raskiewicz* does not categorically foreclose a separate § 1983 action for the same alleged constitutional violations, this Court and state of Maine courts have nonetheless dismissed § 1983 claims where Rule 80B provided an adequate alternative remedy for the plaintiff. In *Copp v. Shane*, the Court dismissed a procedural due process claim where the plaintiffs pursued a Rule 80B claim through the state court system and then later filed constitutional and FOAA claims in federal court. 2018 U.S. Dist. LEXIS 206973, at *2. Relying on *Raskiewicz*, the Court explained that the alleged constitutional deprivations occurred "as part of the action, which the [plaintiffs previously] sought review of pursuant to Rule 80B." *Id.* at *52. The Court further noted that "[e]ven a bad faith refusal to follow state law in local administrative matters does not amount to a deprivation of due process where the state courts are available to correct the error." *Id.* at *51-52 (quoting *Mongeau v. City of Marlborough*, 462 F. Supp. 2d 144, 150 (D. Mass. 2006)); *see also Dubois v. Town of Arundel*, No. AP-17-0024, 2018 Me. Super. LEXIS 46, at *14-15 (Me. Super. Ct. Feb 1, 2018) ("[H]ere, the plaintiffs' allegations occurred during and were a central part of the Board's review of their Application. Thus, review of the Board's decision under Rule 80B is adequate. Because Rule 80B review was available and adequate, it was exclusive. Thus, plaintiffs cannot assert an independent claim for equal protection outside of Rule 80B review of the Board's decision").

46

However, judges in this District have also concluded that because Rule 80B is procedural, and not substantive, failure to bring claims pursuant to Rule 80B in federal court is not grounds for dismissal. In *Portland Cellular Partnership*, the plaintiffs sought a declaratory judgment, which the defendants contended was untimely because the plaintiffs did not bring a Rule 80B challenge to the municipal ordinance within the prescribed statutory time limit. 2015 U.S. Dist. LEXIS 12255, at *4-5. The district court acknowledged that Rule 80B is the "sole means for seeking Superior Court review of a[n] action or failure or refusal to act by any governmental agency," *id.* at *6, but noted that "the rule does not govern federal proceedings in which the Federal Rules of Civil Procedure apply." *Id.*

In Mr. Light's opposition, he states that the "passage of the original ordinance, as well as the process by which Livermore has failed to provide [him] proper licensure, is presently pending as both an M.R. Civ. P. 80B action and a declaratory judgment action." *Pl.'s Opp'n* at 11. Thus, Mr. Light's constitutional allegations related to the Town's initial failure to grant him a license "occurred as part of the action, which [Mr. Light] sought review of pursuant to Rule 80B." *Copp*, 2018 U.S. Dist. LEXIS 206973, at *52 (dismissing a procedural due process claim where Rule 80B provided an adequate remedy). Mr. Light has not alleged that Rule 80B provided an inadequate avenue for review of his equal protection and due process challenges, especially where Rule 80B is designed for such review. *See id.* at *51-52. Moreover, Mr. Light does not argue that "anything prevented [him] from asserting the equal protection [and due process] argument[s] or claims it brings here before the state courts" when he

filed his initial Rule 80B appeal. *Bel-Air Nursing & Rehab Ctr., Inc. v. Town of Goffstown*, No. 16-cv-259-JL, 2018 U.S. Dist. LEXIS 239, at *15 (D.N.H. Jan. 2, 2018); *see also McCarthy*, 2005 U.S. Dist. LEXIS 19724, at *20 (explaining that constitutional claims may be joined with a Rule 80B appeal in state of Maine courts).

The First Circuit and courts in this District have noted that "[f]ederal courts do not 'sit as a super zoning board or a zoning board of appeals'" and that generally, "cases involving 'run of the mill dispute[s] between a developer and a town planning agency' do not rise to the level of a federal due process violation." *Coastal Me. Botanical Gardens v. Town of Boothbay*, No. 2:17-cv-00493-JDL, 2018 U.S. Dist. LEXIS 67607, at *9 (D. Me. Apr. 23, 2018) (first quoting *Raskiewicz*, 754 F.2d at 44 then *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982)). Applying this principle, because there was a clear administrative and judicial remedy available for Mr. Light to challenge the original ordinance on equal protection and due process grounds, Mr. Light cannot now bring a § 1983 claim. However, given the competing conclusions of the caselaw as to the scope and appropriateness of the exclusivity principle, the Court finds it prudent to consider the merits of Mr. Light's constitutional claims. This is especially true in light of the Court's conclusion that Rule 80B is not the proper mechanism for challenging the legislatively enacted ordinance amendment.

### 2. Claims Against the Town of Livermore

Mr. Light alleges four constitutional claims against the town of Livermore: a "class of one" equal protection claim, a disability discrimination equal protection claim, a procedural due process claim, and a substantive due process claim.

### a.    Equal Protection

### i.    Class of One

A "class of one" equal protection claim exists "where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Zell v. Ricci*, 957 F.3d 1, 12-13 (1st Cir. 2020) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). "In general terms, a plaintiff not relying on 'typical' impermissible categories, such as race or religion, must show . . . that the different treatment was based on malicious or bad faith intent to injure." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006)). The "class of one" plaintiff "bears the burden of showing that [his] comparators are similarly situated in all respects relevant to the challenged government action." *Zell*, 957 F.3d at 13 (quoting *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 640 (1st Cir. 2013)).

In identifying an appropriate comparator, a "plaintiff[] must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007). In other words, "there must be sufficient proof on the relevant aspects of the comparison to warrant a reasonable inference of substantial similarity." *Id.* In particular, the plaintiff "must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile," *id.*, although "an exact correlation need not exist between a plaintiff's situation and that of others in order to make a 'similarly situated' comparison." *Zell*,

957 F.3d at 13.  "In the land-use context, this means more than 'point[ing] to nearby parcels in a vacuum and leav[ing] it to the municipality to disprove conclusory allegations that the owners of those parcels are similar situated.'"  *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (alteration in *Freeman*) (quoting *Cordi-Allen*, 494 F.3d at 251 ("The 'similarly situated' requirement must be enforced with particular rigor in the land-use context because . . . [they] 'will often, perhaps almost always, treat one landowner differently from another'" (quoting *Olech*, 528 U.S. at 565) (Breyer, J., concurring))).  "An equal protection claimant 'may not prevail [against a Rule 12(b)(6) motion] simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus."  *Zell*, 957 F.3d at 13-14 (quoting *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992)).

## I.   Similarly Situated Comparators

Here, Mr. Light states that that Board and the Town treated him differently from how they treated Inside Out Indoor Garden Supply, which was licensed in 2019.  *Second Am. Compl.* ¶¶ 25, 30.  The Defendants argue that Mr. Light has not established any comparators because Inside Out Indoor Garden Supply, as a "garden supply store," is not "'situated similarly in all relevant aspects' to a marijuana retail store."  *Defs.' Mot.* at 8 (quoting *Buchanan*, 469 F.3d at 178).  In response, Mr. Light argues that Inside Out Indoor Garden Supply sought the very same license and that it "was not the only entity that has received a license for retail sales."  *Pl.'s Opp'n* at 13-14.

50

When determining whether a plaintiff has properly alleged a comparator that is "similarly situated," the First Circuit considers not only whether the comparator was treated differently by the same authority, board, or governmental entity, but also whether the plaintiff has adequately demonstrated that the comparator is the same in all the ways that the decision maker could have rationally distinguished the plaintiff. In *Najas Realty, LLC v. Seekonk Water District*, 821 F.3d 134 (1st Cir. 2016), the First Circuit concluded that "ten subdivisions or land use projects that had been built in the Town, which the [defendants] had reviewed the plans for" were not "similarly situated" for the purpose of pleading a class-of-one claim. *Id.* at 144. The plaintiffs, a real estate development company and a property holding company, filed a proposal with the Town of Seekonk Planning Board to create a ten-lot subdivision. *Id.* at 137. The plaintiffs alleged that the Board was "bogus[ly]" concerned about the proximity of the subdivision to the Town's water supply and that one Board member was intent on making the plaintiffs "jump every hurdle." *Id.* at 137-38.

For similarly situated comparators, the plaintiffs pointed to "[a] number of other subdivisions and land use projects have been permitted, approved, and built in the Town of Seekonk in which the Seekonk Water District and/or [the Board Member] reviewed the plans submitted for such projects[.]" *Najas Realty, LLC v. Seekonk Water Dist.*, 68 F. Supp. 3d 246, 257 (D. Mass. 2014) (alterations in original), *aff'd* 821 F.3d 134 (1st Cir. 2016). The plaintiffs then "list[ed] the names of 10 projects without description, and contend[ed] that the defendants did not" question "impact on the water supply, potential health risks or the like in connection with any of the

51

projects as they did with the [plaintiff's]." *Id.* On appeal, the First Circuit noted that the plaintiffs failed to explain how the comparators were similarly situated because the complaint did not mention "where they were located, when they were built, whether they were built on environmentally sensitive sites, or their proximity to . . . Town water sources." *Id.* at 144. The *Najas Realty* Court concluded that the complaint "[did] not cut it, even at the pleading stage" because the plaintiffs failed to demonstrate substantial similarity, beyond the assertion that the defendants had been more receptive toward the alleged comparators' development plans. *Id.*

Similarly, in *Clark v. Boscher*, 514 F.3d 107 (1st Cir. 2008), the First Circuit upheld dismissal of a class-of-one claim because the plaintiff failed to allege comparators who were "similarly situated." *Id.* at 114. The plaintiff, who was denied access to a town's water and sewer lines, pointed to three other development projects as comparators: a private subdivision in the neighborhood, an affordable housing community, and an industrial park. *Id.* On appeal the First Circuit rejected the affordable housing community and industrial park as comparators because they were significantly different and "it [was] therefore expected that different policy grounds influenced [the town's] decision to grant municipal services." *Id.* The *Clark* Court agreed with the plaintiff that the residential subdivision was of the same development category, *id.*, but because that proposed comparator was "located on a parcel of land different from [the plaintiff's]" it was impossible to conclude that the town's same concerns about contamination on the plaintiff's property applied to the comparable residential subdivision. *Id.*

Applying First Circuit precedent, the Court concludes that Mr. Light fails to allege a similarly situated comparator as part of his class-of-one claim.  Mr. Light submits that Inside Out Indoor Garden Supply is a proper comparator because it was granted the same license Mr. Weaver had applied for during the same period. Although the Court concludes that the similarity or sameness of the license sought is relevant to whether Inside Out Indoor Garden Supply is similarly situated, it is not, in and of itself, sufficient to establish that it is similarly situated under First Circuit law.

First, the Second Amended Complaint notes that Inside Out Indoor Garden Supply was licensed in June 2019, *Second Am. Compl.* ¶ 30, but even assuming that Inside Out Indoor Garden Supply received the exact same type of retail medical marijuana license that Mr. Weaver sought (which is not clear from the Second Amended Complaint), this only establishes that Mr. Weaver was treated differently but does not explain why.  *See Pagán v. Calderón*, 448 F.3d 16, 35 (1st Cir. 2006) (concluding that allegations that a government entity granted another party the same loan the plaintiff applied for were sufficient to establish that the defendant "treated another loan applicant differently" but did not establish that the other loan applicant was "similarly situated").  Although the Court infers that Inside Out Indoor Garden Supply was subject to the same Board requirements in June 2019 that Mr. Weaver was subject to in November 2019 when he submitted his application to the Board, *see SBT Holdings, LLC*, 547 F.3d at 35 (concluding that it was proper to infer that comparators were subject to the same environmental obligations in light of the court's

obligation to draw all rational inferences in favor of the plaintiffs on a motion to dismiss), this does not save Mr. Light's class-of-one claim.  Mr. Light must do more than simply show that another business was treated differently because "[o]therwise, a disappointed applicant for a state or local benefit could manufacture a constitutional claim by the simple expedient of alleging differential treatment." *Pagán*, 448 F.3d at 35.

Even assuming that Inside Out Indoor Garden Supply received a medical marijuana retail license, the amended complaint does not explain whether the business is exclusively a medical marijuana caregiving business, or whether, as the business name suggests, it is also a garden supply store.  In other words, Mr. Light has not alleged that Inside Out Indoor Garden Supply conducts the exact same type of business or that the same policies undergirding the Board's decision to grant Inside Out Indoor Garden Supply the license applied to its evaluation of Mr. Weaver's application.  *See Clark*, 514 F.3d at 114 (concluding that a proposed comparator may not be similarly situated if the governmental entity had different applicable policies for granting or denying a license); *Every v. Town of Littleton*, 380 F. Supp. 3d 173, 183 (D.N.H. 2019) (concluding, absent additional factual allegations, that the mere identification of other businesses experiencing wastewater discharges was insufficient to establish a similarity situated comparator given "a panoply of factors that might have led the town to rationally distinguish between purported violators in making decisions about whether and whom to charge with sewage ordinance violations").

Furthermore, like the plaintiffs in *Clark* and *Najas Realty*, Mr. Light has not established that Inside Out Indoor Garden Supply's premises and location are sufficiently similar to Mr. Weaver's business. In his Amended Complaint Mr. Light alleges that Mr. Manter was particularly concerned about the proximity of Mr. Weaver's property to a baseball field, and a speech therapist's office, both of which later became safe zones as result of the ordinance amendment. *Am. Compl.* ¶ 22. Mr. Light has not alleged that Inside Out Indoor Garden Supply is located in similar proximity to safe zones, childcare facilities, or other areas protected by the Town's ordinance. As a result, the Court cannot conclude that the Board granted Inside Out Indoor Garden Supply a license despite harboring the same concerns that applied to Mr. Weaver's property. *See Najas Realty*, 821 F.3d at 114 (affirming dismissal where the plaintiff failed to demonstrate the proposed comparators were similarly "built on environmentally sensitive sites" or close to "Town water sources"); *Clark*, 514 F.3d at 114 (affirming dismissal because it was impossible to conclude that the town's same concerns about contamination on the plaintiffs' property applied to their proposed comparator residential subdivision).

Finally, Mr. Light undermines his class-of-one claim by arguing that Mr. Weaver was been discriminated against because of his class membership as an individual with disabilities. In *Zell v. Ricci*, the First Circuit rejected a class-of-one claim in part because the plaintiff also asserted that she "[fell] within a protected class." 957 F.3d at 14 (quoting *SBT Holdings*, 547 F.3d at 33). The *Zell* Court elaborated that "[b]ecause a class-of-one contention necessarily means [the plaintiff]

was 'singled out for reasons unique to [her], not because of [her] membership in a particular group,' . . . to also have the complaint allege that she is a member of a protected class, and where she makes clear . . . that she is not pleading in the alternative, rather undercuts the class-of-one angle she's now arguing." *Id.* (quoting *Najas Realty*, 821 F.3d at 144).

Here, Mr. Light attempts to place Mr. Weaver in a similar situation as the plaintiff in *Zell* by making "two independent equal protection arguments" that contradict one another. *See Pl.'s Opp'n* at 13. On one hand, Mr. Light argues that Mr. Weaver was discriminated against because he had a disability and therefore held membership in a particular group. On the other hand, Mr. Light argues that Mr. Weaver was singled out because of attributes unique to him and no other member of a group.

First Circuit precedent is clear that the mere allegation that another entity submitted the same application and received the same license that a plaintiff sought does not establish that the businesses are "similarly situated" comparators to survive a motion to dismiss.[7] The Court concludes that Mr. Light has not properly pleaded a class-of-one Equal Protection claim.

---

[7]      Mr. Light cites *SBT Holdings* in his opposition, *Pl.'s Opp'n* at 14; however, *SBT Holdings* is easily differentiated on its facts. In *SBT Holdings*, the plaintiff purchased three units to build condominiums and identified, as comparators, the subsequent purchasers of the property and the finished condominiums. 547 F.37 at 30, 34. Because the comparators in *SBT Holdings* held the exact same property, the plaintiffs easily demonstrated that their property was similar (the same, actually) in terms of its location and physical attributes. At issue was only whether the "subsequent purchasers were subject to the same or similar statutory and regulatory requirements as the developer," which the First Circuit concluded was appropriate to infer from the complaint. *Id.* at 35. In this case, however, because the comparator is located elsewhere, the absence of information regarding the physical nature of Inside Out Indoor Garden Supply, its location, and its attributes is material because

### ii.    Disability Discrimination

The Equal Protection Clause of the Fourteenth Amendment "requires states to treat alike all persons similarly situated." *Toledo*, 454 F.3d at 33 (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  "To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)); *see also K v. City of S. Portland*, 407 F. Supp. 2d 290, 300 (D. Me. 2006) (citing *Barrington Cove Ltd. P'ship v. R.I. House & Morg. Fin. Co.*, 246 F.3d 1, 8 (1st Cir. 2001)).  The First Circuit applies the same standard for determining whether an individual is "similarly situated" as it does for class-of-one equal protection claims as discussed above.  *See Davis*, 892 F.3d at 133 ("An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated'" (quoting *Barrington Cove Ltd. P'ship*, 246 F.3d at 8))

"Unless state action burdens a suspect class or impinges upon a fundamental right [the First Circuit] review[s] equal protection claims for a rational relationship between the disparity of treatment and a legitimate government purpose." *Toledo*,

---

the Court cannot infer comparability between the properties, especially because the proximity of Mr. Weaver's property to certain areas within the Town was relevant to the Board's inquiry.

454 F.3d at 33.  The First Circuit has explicitly stated that "[t]he disabled are not a suspect class for equal protection purposes."  *Id.* (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  As a result, states "may treat disabled [individuals] differently . . . so long as the states' actions are rationally related to some legitimate governmental purpose." *Id.* (citing *Bd. of Trs. v. Garrett*, 531 U.S. 356, 366-68 (2001)).  However, a state may not "treat disabled [individuals] differently solely out of 'irrational prejudice.'" *Id.* (quoting *Cleburne*, 473 U.S. at 450).  A plaintiff "must [also] show that Defendants selected or reaffirmed a course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *K.*, 407 F. Supp. 2d at 300 (internal quotation marks omitted) (citing *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

In response to the Town's motion to dismiss Mr. Light must show that the Town's decisions "were irrational and not motivated by any conceivable legitimate reason." *Toledo*, 454 F.3d at 33.  Mr. Weaver must also identify comparators who are similarly situated "in all relevant respects." *See K.*, 407 F. Supp. 2d at 300 (citing *Barrington Cove Ltd. P'ship*, 246 F.3d at 8).

## I.   Similarly Situated Individuals

Mr. Light argues that, for the purposes of Mr. Weaver's equal protection disability claim, "the proper comparators are *not* other disabled individuals, rather they are applicants without Plaintiff['s] disability." *Pl.'s Opp'n* at 14-15 (emphasis original).  Mr. Light submits that "[n]o other individual who received a medical marijuana business license was treated with such utter disrespect and hostility or was precluded from participating in the process because their difficulties breathing

and speaking made them difficult to understand." *Id.* at 15.  In reply, the Defendants disagree that non-disabled applicants can be proper comparators and maintain that Mr. Light cannot bring a disability discrimination claims on behalf of Mr. Weaver without identifying "similarly situated individuals with disabilities who were treated differently than [him]." *Defs.' Reply* at 6.  However, the Court need not resolve this dispute, because even assuming that other applicants without Mr. Weaver's disability are the proper comparators, Mr. Light has not sufficiently alleged such an applicant in his Second Amended Complaint.

In *Toledo v. Sanchez*, a plaintiff argued that he was discriminated against on the basis of his disability because his professor gave him a failing grade and treated him differently than other students who arrived late to class.  454 F.3d at 34.  In addition to recounting his mental health he alleged he was "repeatedly 45 minutes late to his design class, absent for several weeks due to a hospital stay, and that many of his assignments were late or incomplete." *Id.*  In this case, the *Toledo* Court defined a "similarly situated" individual as one with "similar records [who] received better than a failing grade" or another "late-arriving student[] [who] had the same record of repeated tardiness." *Id.*  The First Circuit concluded that Mr. Toledo failed to state an equal protection claim for disability discrimination because he failed to identify similarly situated individuals. *Id.*

In *Buchanan v. Maine*, a plaintiff brought a § 1983 claim against the manager of a mental health treatment program alleging that the manager had discriminated against him because of his disability by failing to create an Individualized Support

Plan (ISP) program for him.  469 F.3d at 177-78.  Regarding the "similarly situated" analysis, the First Circuit concluded that similarly situated individuals were "clients who had severe mental health problems similar to Buchanan's, who had declined to participate in the ISP process, but who nevertheless received team-produced ISPs." *Id.* at 178.  Accordingly, the *Buchanan* Court rejected the plaintiff's argument that similarly situated individuals were "high-risk mental health clients who received a team produced [ISP]."  *Id.*

Similarly, in *Ms. K. v. City of South Portland*, 407 S. Supp. 2d 290 (D. Me. 2006), a plaintiff brought an equal protection claim based on disability discrimination alleging that a school denied special education transport by improperly moving a wheelchair-bound student from the special education bus to the regular bus.  *Id.* at 294.  The plaintiff "identified the group of similarly situated persons as special education students who were not wheelchair bound" and argued that "by being moved to the regular bus [the student] and all other non-wheelchair bound special education students were treated differently from all other similarly situated students."  *Id.* at 300.  The district court rejected this argument, concluding that the plaintiff failed to allege a proper comparator because the plaintiff did "not clearly identify who these other similarly situated student are."  *Id.*  The district court further rejected the contention that "non-wheelchair bound special education students are in all relevant respects similarly situated to wheelchair bound special education students and, thus, both groups should have been transported in the same manner."  *Id.*  The district court elaborated that "when it comes to transportation, all special education students

capable of walking are not categorically the same as special education students who utilize wheelchairs," and, as a result, the plaintiff did not demonstrate that "other special education[] students who were moved to regular busing were being treated differently because of an unconstitutional classification." *Id.*

As in *Toledo, Buchanan,* and *Ms. K.*, the Court concludes that Mr. Light has not properly alleged that Mr. Weaver was treated differently from other similarly situated individuals.  First, even assuming that non-disabled individuals are the proper comparators, Mr. Light provides no additional information as to specific individuals who meet the description of non-disabled individuals who applied for a medical marijuana retail license from the Town, received that license, and had a similar business to Mr. Weaver's. *See Knox v. Mass Dep't of Corr.*, No. 1:14-cv-12457-LTS, 2017 U.S. Dist. LEXIS 126206, at *42 (D. Mass. July 20, 2017) (concluding that a "passing reference to wheelchair-bound or otherwise mobility-limited inmates" was not enough to show that others were similarly situated without additional evidence that those wheelchair-bound individuals also required similar treatment, housing, and therapy placement as the plaintiff).  Even assuming that Inside Out Indoor Garden Supply is the alleged comparator for both Mr. Light's class-of-one and disability discrimination equal protection claims, Mr. Light has not alleged that the person who applied for Inside Out Indoor Garden Supply's license is a non-disabled individual.  Nor does Mr. Light provide any information as to how the person who applied for the Inside Out Indoor Garden Supply license was treated differently by the Board and the Town.

Furthermore, just as the district court concluded that "all special education students capable of walking are not categorically the same as special education students who utilize wheelchairs," *see Ms. K.*, 497 F. Supp. at 294, not all applicants for a medical marijuana retail store who do not have Mr. Weaver's specific disability are categorically the same in all respects except the disability. In the absence of additional alleged facts such as the person's status as a registered caregiver, the size and location of the business, proximity to safe zones, similarity of products sold, and timing of the application, even accepting Mr. Light's allegations as true, it is impossible to conclude that a non-disabled person applying for the same license is similar in all necessary respects such that the Court could conclude that the only salient difference from Mr. Weaver is that Mr. Weaver was disabled. *See Knox*, 2017 U.S. Dist. LEXIS 126206, at *42.

## II.   Rational Basis Review

Even assuming that Mr. Light alleged a similarly situated individual, to withstand dismissal, he must also have alleged that "Defendants selected or reaffirmed a course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Ms. K.*, 407 F. Supp. 2d at 300 (internal quotations omitted) (citing *Feeney*, 442 U.S. at 279). As previously stated, disability discrimination is subject to rational basis review meaning that there must be a "rational relationship between the disparity of treatment and a legitimate government purpose." *Toledo*, 454 F.3d at 33 (citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Although Mr. Light alleges in his complaint impropriety and demeaning comments by the Board when he initially submitted his application, Mr. Light has

62

not alleged that they intentionally treated him differently nor has he identified specific times when similarly situated individuals were treated differently.  *See Copp*, 2018 U.S. Dist. LEXIS 206973, at *48 (citing *Buchanan*, 469 F.3d at 178 ("Plaintiffs claiming an equal protection violation must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that plaintiffs were singled out for unlawful oppression")).  Moreover, Mr. Light also fails to show that despite the Board's comments, the Board did not grant Mr. Weaver the license because of his disability and for no other reason such as safety concerns, limiting the number of marijuana retails stores in the area.

Furthermore, in his Second Amended Complaint Mr. Light refers to  hearings held on Zoom because of the pandemic.  *See Second Am. Compl.* ¶ 77.  Although the Zoom process may limit certain peoples' access to public meetings, there is a rational relationship between use of Zoom and the government's interest in reducing gathers of people to limit the spread of Covid-19.  Such efforts to reduce the spread of Covid-19 have been routinely upheld by this District as a rational exercise of state and municipal authority.  *See Fortuna v. Town of Winslow*, No. 1:21-cv-00248-JAW, 2022 U.S. Dist. LEXIS 104678, at *49-51 (D. Me. June 13, 2022) (concluding that a school mask mandate to prevent the spread of COVID-19 withstands rational basis review); *Doe v.* Mills, No. 1:21-cv-00242-JDL, 2021 U.S. Dist. LEXIS 197251, at *52 (D. Me. Oct. 13, 2021) (concluding that an employer COVID-19 vaccine mandate withstands rational basis review); *see also Calvary Chapel v. Mills*, 459 F. Supp. 3d 273, 284 (D.

Me 2020) (concluding that a state executive order limiting the gathering size in religious institutions withstood rational basis review under the Free Exercise Clause). Here, there is clearly a rational relationship between holding public meetings over Zoom to limit in-person gatherings, which increase the risk of spreading COVID-19.

Thus, even when accepting the allegations in the Amended Complaint as true, the Court can draw no inference that the government implemented Zoom hearings to "irrationally prejudice" individuals with disabilities. Mr. Light has not stated a valid claim for disability discrimination under the Equal Protection Clause of the Fourteenth Amendment. The Court grants Defendants' motion to dismiss as to Mr. Light's equal protection claims.

### b.    Due Process

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving any person from "live, liberty, or property, without due process of law," U.S. CONST. amend. XIV, § 1, and "applies fully to a state's political subdivisions, including municipalities and municipal agencies." *Harron v. Town of Franklin*, 660 F.3d 531, 535 (1st Cir. 2011) (citation omitted). "The Due Process Clause has both procedural and substantive components." *Id.* Procedural Due Process "ensures that government, when dealing with private persons, will use fair procedures." *Id.* (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005). Substantive Due Process "safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them." *Id.* at 535-36 (quoting *DePoutot*, 424 F.3d at 118).

### i.   Procedural Due Process

In considering whether Mr. Light has stated a plausible procedural due process claim the Court "first asks whether there exists a liberty or property interest which has been interfered with by the State; [and] second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Harron*, 60 F.3d at 537 (quoting *González-Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010)); *see also Copp*, 2018 U.S. Dist. LEXIS 206973, at \*50.

Mr. Light argues that "both a liberty and a property interest are implicated" here because (1) Mr. Weaver was "already a licensed caregiver who is protected from municipal regulation by state statute," (2) "because federal law still treats marijuana as an illegal substance, placing [him] in a safe zone could have extreme implications with respect to penalties should the Federal Government resume enforcement of its Federal Criminal law," and (3) "Maine Law treats professional business licenses as property rights." *Pl's. Opp'n* at 15-16 (citing *Balian*, 772 A.2d at 364). The Defendants argue in turn that Mr. Light "has not alleged that the Town somehow deprived him of his State caregiver license" and that he "has failed to otherwise show that he was deprived of protected property interest." *Defs.' Reply* at 6-7.

Whether there is a "legitimate claim of entitlement to property" depends on "existing rules or understandings that stem from an independent source such as state law." *Davis*, 802 F.3d at 134 (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 8 (1st Cir. 2005)). "An abstract need or desire or a unilateral expectation are not sufficient to cement a constitutionally protected interest." *Id.*

(internal quotation marks omitted) (quoting *Centro Medico del Turabo, Inc.*, 406 F.3d at 8).

Whether Mr. Weaver had a legitimate property interest depends on whether the Board's statements in December 2019 that Mr. Weaver was "good to go," that his "application was approved," and that "he could start operating his business," *Second Am. Compl.* ¶¶ 25, 27, constituted "municipal approval" under 22 M.R.S. § 2429-D(2) such that he was a protected medical marijuana retailer at the time the Town passed its ordinance in August 2020.

Section 2429-D of the MMUMA allows municipalities to regulate registered caregivers and medical marijuana retails stores but expressly states that a municipality may not "[p]rohibit caregiver retails stores . . . that are operating with municipal approval in the municipality prior to the effective date of this section." 22 M.R.S. § 2429-D(2). The relevant section became effective September 19, 2019. *Id.* "Municipal approval" is defined as "an examination and approval of the store, dispensary or facility for the use of the premises consistent with conduct authorized under this chapter, including but not limited to, a conditional use approval or site plan approval." *Id.* The statute goes on to state that "'municipal approval' does not include issuance of a building, electrical or other similar permit or authorization that does not address the use of the structure or facility for which the permit or authorization is issued." *Id.*

When read alongside 22 M.R.S. § 2429-D(2), Mr. Light's Second Amended Complaint has not alleged a protected property interest. The Amended Complaint

states that Mr. Weaver did not submit his site plan to the Planning Board for consideration until November 2019, *Second Am. Compl.* ¶ 22, and it was not until December 2019 that the Board conducted a walkthrough of his site and told Mr. Weaver he was "good to go." *Id.* ¶ 25.

Even assuming that Mr. Weaver was granted "municipal approval" as defined by § 2429-D(2), Mr. Weaver was not protected as a "caregiver retail store" operating "prior to the effective date of this section" because he initially filed his retail application in November 2019, after the section 2429-D went into effect in September 2019. *See* 22 M.R.S. § 2429-D(2) (stating that the prohibition only applies to caregiver retail stores granted approval prior to the effective date). Moreover, Mr. Weaver was not yet "operating" as a medical marijuana retailer as of September 2019 as he has not alleged that his store was already open. In fact, the opposite is true because Mr. Weaver was still seeking retail store licensure at that time.

Setting aside timing, the Court is also not convinced that Mr. Weaver would have qualified as having been granted "municipal approval." Although the Board conducted a walkthrough of the space and examined the potential cite as required for "municipal approval" under the 22 M.R.S. § 2429-D, the Board only gave verbal "approval," which Mr. Light has not alleged was sufficient to constitute "licensure" prior to the enactment of the ordinance. In fact, in the Amended Complaint, Mr. Light implies that even before the enactment of the Ordinance, the town of Livermore required a formal license (rather than just oral approval of a license) to open a medical marijuana retail shop. *See Second Am. Compl.* ¶ 25 (stating that in November 2019

the board stated that another meeting would be necessary to approve the *license*); *id.* ¶ 28 (stating that in January 2020 (prior to the formal enactment of the Town Ordinance) that Mr. Weaver requested that the town formally grant him the license and that other applicants had received such a license); *id.* ¶ 30 (explaining that Inside Out Indoor Garden Supply received a license in June 2019, more than a year prior to the official enactment of the Town's marijuana ordinance).  Because the Court can infer from Mr. Light's Second Amended Complaint that the Town issued formal licenses even before the Ordinance was enacted, verbal authorization that Mr. Weaver was "good to go" does not constitute "municipal authorization" sufficient to protect Mr. Weaver under 22 M.R.S. § 2429-D.

Because Mr. Weaver was given verbal approval but never received a license, he may have had an expectation interest, but not a property interest necessary to sustain a procedural due process violation claim.  In *Moore, Inc. v. City of Westbrook*, 2009 Me. Super. LEXIS 163 (Me. Super Ct. Oct 8, 2009), the Maine Superior Court rejected a procedural due process claim where the plaintiff alleged that because he had a property interest in his state liquor license, he also had a property interest in the renewal of his city-issued victualer's license, especially because the city clerk usually granted such licenses as a matter of course.  *Id.* at *14, 17.  Relying on *Chongris v. Board of Appeals of the Town of Andover*, 811 F.2d 36 (1st Cir. 1987) and *City of Old Town v. Dimoulas*, No. CV 98 124, 2001 WL 35980916 (Me. Super. Feb. 12, 2001), the superior court concluded that although the plaintiff "may have expected to receive a victualers license," an expectancy interest did not arise to the level of a

property interest sufficient to bring a due process claim under § 1983.  *Id.* at *18. Notably, in *Moore*, the plaintiff was seeking renewal of a license his business had received in the past, rather than, as is the case here, a license for the first time.  *Id.* at *7.

Similar to the plaintiff in *Moore*, Mr. Weaver may have expected to receive a license, based on the Board's statements implying he would receive one and that he was "good to go," but because the Town never actually granted him a license, he did not have a property interest.  This is especially true as Mr. Weaver acknowledged that other operators had received licenses and that any approval required receipt of an actual license.  Because Mr. Weaver had merely an expectation interest, rather than a property interest, Mr. Light fails to state a claim that enactment of the ordinance violated Mr. Weaver's due process rights.  Furthermore, because Mr. Weaver had no property interest at stake in the passage of the original ordinance, he similarly had no property interest at the time the ordinance was amended and therefore Mr. Light cannot state a claim for violation of Mr. Weaver's due process rights as to the ordinance amendment.

Although the First Circuit has held that an applicant may have a protected property interest in a benefit, *see Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973), this principle generally only applies where "the benefit, license, or program for which he applies is routinely granted to all applicants meeting objective or easily judged criteria." *Welch v. Paicos*, 66 F. Supp. 2d 138, 164-65 (D. Mass. 1999).  However, here, Mr. Light has not alleged that the Town routinely granted such licenses prior to

enactment of the ordinance. *See Gonzales v. Comm'r, Dep't of Pub. Safety*, 665 A.2d 681 (Me. 1995) ("An applicant for a permit does not have a property interest in that permit if there is broad discretion to withhold the benefit.  When the provider has broad discretion, the applicant cannot have a reasonable claim of expectation or entitlement to the permit").

Finally, the Court rejects Mr. Light's arguments that Mr. Weaver had protected property and liberty interest (1) because he "is already a licensed caregiver who is protected from municipal regulation by state statute," (2) "because federal law still treats marijuana as an illegal substance, [and] placing [him] in a safe zone could have extreme implications with respect to penalties should the Federal Government resume enforcement of its Federal Criminal law," and (3) "Maine Law treats professional business licenses as property rights." *Pl's. Opp'n* (citing *Balian*, 772 A.2d at 364).

First, Mr. Light has not alleged that Mr. Weaver's state-issued caregiver registration was impacted by the Board and Town's decision, the medical marijuana ordinance, or the amendment.  Although Mr. Weaver must have been a registered caregiver to qualify for a Town retail license, *Ordinance* at 3-4 ("Persons or entities wishing to establish a Medical Marijuana business within the Town of Livermore shall first obtain a State of Maine Medical Marijuana Caregiver License and then apply for a permit/license form the Town of Livermore and shall be subject to the provision of this Ordinance"), there is nothing in the Second Amended Complaint

suggesting that Mr. Weaver could not have continued to operate as a registered caregiver even though the Town did not issue him a retail store license.

The MMUMA provides, among other provisions, that a registered caregiver can provide medical marijuana to patients in certain amounts, cultivate a certain number of plants, assist patients with the use of medical marijuana, and receive compensation for their services. *See* 22 M.R.S. § 2423-A(2)(A)-(Q). Although the ordinance regulates "medical marijuana businesses" in Livermore, which includes stores, cultivation facilities, manufacturing facilities, and testing facilities, *see Ordinance* at 4-5, the ordinance did not strip Mr. Weaver of his state caregiver license or prohibit him from engaging in other statutorily authorized registered caregiver activities including providing patients medical marijuana not in a "store" setting, assisting patients with the use of medical marijuana, and cultivating a certain number of plants. Ultimately, while the ordinance may regulate medical marijuana retail stores, Mr. Light fails to allege that all Mr. Weaver's state-authorized caregiver activities were prohibited by the ordinance.

Second, the Court also rejects Mr. Light's argument that Mr. Weaver had a protected liberty interest because being placed in the "safe zone" area could have implications should the federal government enforce federal criminal law. Although Mr. Light is correct that marijuana remains a controlled substance under federal law and Mr. Weaver could have theoretically been federally prosecuted for possession and distribution of marijuana, Mr. Light has not adequately explained why this concern is more than speculation. This is especially true in the absence of evidence that the

71

federal government has or is intending to resume enforcement despite legalization at the state level.  Mr. Light has also failed to support his proposition that if the federal government had prosecuted Mr. Weaver under federal criminal law for the possession and distribution of marijuana, it would have enhanced his punishment because his property was located in a municipal safe zone.  Of course, there is no allegation in the Second Amended Complaint that the federal government investigated or prosecuted Mr. Weaver while he was alive for his non-retail store registered caregiver activities or prosecuted any other registered caregiver for operating a caregiver retail store.

Finally, as to Mr. Weaver's argument that "Maine law treats professional licenses as property rights," the Court has already concluded that Mr. Weaver may have had an expectation interest in the retail license, but not a property interest. Moreover, Mr. Light offered no argument as to why the Court should categorize a medical marijuana retail license as a "professional license" rather than more akin to a discretionary victualers or alcohol license.

The Court grants Defendants' motion to dismiss as to Mr. Light's procedural due process claims.

## ii.  **Substantive Due Process**

When a plaintiff challenges the executive acts of a municipality by alleging a substantive due process violation, "the plaintiff must show *both* that the acts were so egregious as to shock the conscious *and* that they deprived him of a protected interest in life, liberty, or property." *Pagán*, 448 F.3d at 32 (emphasis in original); *see also Copp*, 2018 U.S. Dist. LEXIS 206973 at *49 (quoting *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st Cir. 2001) ("To establish a substantive due process claim, a plaintiff must

72

demonstrate an abuse of government power that shocks the conscience or action that is legally irrational in that it is not sufficiently keyed to any legitimate interest"). There is no specific formula for determining whether government conduct is "conscious shocking" but "[e]xecutive acts that shock the conscience must be 'truly outrageous, uncivilized, and intolerable" and "the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." *Harron*, 660 F.3d at 536 (first quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999), then *Amsden v. Moran*, 904 F.2d 748, 754 n.5 (1st Cir. 1990)).  The First Circuit has described that "[a] hallmark of successful challenges is an extreme lack of proportionality" and "so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhuman abuse of official power literally shocking to the conscience." *Id.* (quoting *González-Fuentes*, 607 F.3d at 881).

The Court agrees with the Defendants that the conduct here is not conscience shocking.  Mr. Light points to a handful of paragraphs in his complaint as evidence of conscience shocking conduct including the Board's conduct in November 2019 when Mr. Weaver was told to "get the fuck out" and get a spokesman so they could understand him, the Board's failure to grant Mr. Weaver his license even after they told him his application was approved; the Board's different treatment of Inside Out Indoor Garden Supply; the board's email meeting in violation of FOAA; the Board's decision to amend the ordinance so that it included proximity to childcare facilities, including the children's speech therapists office; that the Town measured his property

from the vacant lot, which rendered his property noncompliant under the ordinance; that he was frequently given the runaround by the Town and the Town's building was frequently closed to the public; the Town did not give him the up to date draft of the marijuana ordinance; the Town made him go through a misguided process while other license applicants were guided through a simpler process; that he had difficulty communicating with the Board because of his disability, which was made worse by the Zoom meetings; that the Town put him at increased risk of violations of the federal criminal code; and that, more generally, the Board acted with bias, discriminatory animus, hostility toward him and rudeness. *Second Am. Compl.* ¶¶ 22, 28-33, 37, 43, 52-54, 67, 75, 77-79, 86, 88.

As a threshold matter, the First Circuit has concluded that "any permit or license denial, no matter how unattractive, that falls short of being 'truly horrendous' is unlikely to qualify as conscience-shocking.'" *Harron*, 660 F.3d at 536 (quoting *Pagán*, 448 F.3d at 33). The Court does not approve of the alleged conduct by some members of the Planning Board and wishes that the members had treated a member of the public and resident of the Town with more respect. Nevertheless, none of the Town's conduct rises to the level of being "truly horrendous" and courts have repeatedly concluded that government decisions driven by bias and animus is not "conscience shocking," nor is selective enforcement, singling out one person or entity, or making decisions that are in violation of state law. *See Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 639 (1st Cir. 2013) (reasoning that "a pattern of selective and excessive enforcement of municipal regulations" did not "plausibly allege" a substantive due process violation); *Freeman*, 714 F.3d at 34, 40 (concluding that disparaging

comments were not conscience shocking); *Clark*, 514 F.3d at 112-13 (concluding that

an alleged pattern of "arbitrary, unreasonable, and capricious acts" did not rise to the

level of "conscience shocking"); *Mongeau*, 492 F.3d at 19 (rejecting plaintiff's

substantive due process claim because denial of a building permit and "interfer[ence]

in the zoning process for improper reasons" does not shock the conscience); *Collins v.

Nuzzo*, 244 F.3d 246, 251 (1st Cir. 2001) (concluding that a contentious relationship

with a board did not rise to the level of a substantive due process violation where the

plaintiff alleged that the board's decisions were driven by animus); *Licari v. Ferruzzi*,

22 F.3d 344 346, 349-50 (1st Cir. 1994) (holding that "a regulatory board does not

transgress constitutional due process requirements merely by making decisions for

erroneous reasons or by making demands which arguably exceed its authority under

the relevant state statutes" and rejecting a substantive due process claim based on

allegations of hostility and animus); *Raskiewicz*, 754 F.2d at 45 (rejecting the

plaintiff's substantive due process claim alleging bias and conspiracy where a board

stated the plaintiff would "never be given a . . . permit" but granted a competitor the

same permit); *Stuart v. City of Gloucester*, No. 18-cv-11877-ADB, 2019 U.S. Dist.

LEXIS 117327, at *29 (D. Mass. July 15, 2019) (concluding that "unfair" and "biased"

government conduct does not rise to the level of a substantive due process claim).

Setting aside this robust First Circuit precedent, the alleged acts are

themselves not conscience shocking.  Taking Mr. Light's allegations as true, the

Board's conduct and statements regarding Mr. Weaver's disability, singling him out,

and making the licensure process more difficult than for other businesses, while

75

objectionable, is not so horrendous to rise to the level of an actionable substantive due process claim.   Moreover, because "[c]harges of bias, bad faith, and other 'opprobrious epithets of malice,'" are common in such cases, the First Circuit has routinely concluded that "[if] all that were required to secured federal jurisdiction were loose claims of conspiracy and corruption, virtually any case of this type could be brought into federal court. *Raskiewicz*, 754 F.2d at 44 (citation omitted).

Such is the case here.   Mr. Weaver may have been dissatisfied with the outcome, but Mr. Light's recitation of his late father's allegations does not arise to the level of a substantive due process violation.   This is especially true, as the Board had an interest in regulating medical marijuana retail stores and creating mechanisms for ensuring safety in certain areas of the municipality.   *See Harron*, 660 F.3d at 536 (explaining that the municipality had a legitimate government interest in enforcing the town's liquor licensing laws) (citing *Gonzàlez-Fuentes v. Molina*, 607 F.3d 864, 883 (1st Cir. 2010) ("[T]he executive actions most likely to shock the conscience are those that are 'intended to injure in some way unjustifiable by any government interest'" (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998))).   The Court dismisses Mr. Light's substantive due process claims.

In sum, the Court concludes that Mr. Light has not stated a claim for constitutional violations under § 1983 on which relief can be granted, the Court grants the Defendants' motion to dismiss as to Count II of the Amended Complaint.

### 3.    Claims Against Individual Defendants

As to the individual defendants,[8] the Defendants argue that the claims against them should be dismissed because they are protected by qualified immunity.  *Defs.'* *Mot.* at 13-14.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Copp*, 2018 U.S. Dist. LEXIS 206973, at *54 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The First Circuit applies a two-part test for determining whether a public official is entitled to qualified immunity: (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232.  "Qualified immunity is applicable unless the official's conduct violated a clearly established right."  *Id.*

---

[8]        Regarding Mr. Miller, Mr. Chretien, Mr. Deyling, Mr. Richmond, Mr. Guild, Ms. Martin, and Mr. Berry, the Defendants state that Mr. Light "fails to allege that any of those individuals are employees or officials of the Town." *Defs.' Mot.* at 12. Mr. Light argues that this a "technical" argument and "[a]s can be inferred, and as is required to be inferred in Plaintiff's favor by 12(b)(6), each of the listed individual defendants is a Town official who is a current or former Town Administrator (Byron and Miller), Planning Board Member (Manter, Perkins and Berry), or Selectboard member (Chretien, Deyling, Richmond, Guild and Martin). *Pl.'s Opp'n* at 17-18.
        "42 U.S.C § 1983 grants individuals the right to sue those 'acting under color of any statute, ordinance, regulation, custom, or usage of any State . . . [for] the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. *Freeman*, 714 F.3d at 37.  To prevail, a plaintiff must show that 'the challenged conduct [is] attributable to a person acting under color of state law' and that 'the conduct must have worked a denial of rights secured by the Constitution or by federal law.'" *Id.* (quoting *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir. 1997)).  By this standard, the Defendants are correct that a simple statement that a defendant resides in a particular town is insufficient to establish that they were acting in their official capacity as a municipal employee or an elected official.
        However, even assuming Mr. Light had properly alleged a cause of action against these defendants the Court would nonetheless dismiss the claims against them as they are protected by qualified immunity.

The First Circuit has stated that "[t]he failure of [a plaintiff's] constitutional claims obviates [the] need to address the qualified immunity defense" because the claim fails the first prong of the qualified immunity analysis: a constitutional violation. *Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 134 (1st Cir. 2005); *see also Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery"); *Krah v. Cnty of Lincoln*, No. 2:16-cv-00415-JDL, 2017 U.S. Dist. LEXIS 50151, at *31 (D. Me. Apr. 2, 2017) ("The plaintiff's failure to state plausible claims against [the defendant] entitles him to qualified immunity). Based on the Court's previous analysis and conclusion that Mr. Light has not stated an equal protection, procedural due process, or substantive due process claim on which relief can be granted, the Court similarly concludes that Mr. Light cannot make out a "violation of a constitutional right" under the first qualified immunity inquiry. Furthermore, based on the cases cited by the Court in its equal protection, substantive due process, and procedural due process analyses, Mr. Light cannot demonstrate that it was "clearly established" in 2019 that the Defendants' actions unconstitutionally singled Mr. Weaver out, discriminated him on the basis of his disability, or unconstitutionally deprived him of a constitutionally protected property interest.

In opposition to the Defendants' qualified immunity defense, Mr. Light says that because qualified immunity is an affirmative defense, a claim cannot be

dismissed on a 12(b)(6) motion unless "the facts establishing the defense are definitively ascertainable from the complaint and other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *Pl's Opp'n* at 18 (quoting *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006)). Mr. Light asserts that "[t]hat's just not the case here" based on the 22 M.R.S. § 2423-A(2) and § 2429-D(2) and *Olech* and *SBT Holdings*. *Id.* Mr. Light's arguments fail for several reasons.

First, the First Circuit has repeatedly held that "immunity is to be resolved at the earliest possible state in litigation." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). Mr. Light has not squared this principle with his argument regarding affirmative defenses more generally and merely states that this is a case where the facts are not "definitively ascertainable" without explaining why he believes that, especially in light of his other arguments that he has sufficiently stated a claim on which relief can be granted.

Second, although qualified immunity can be denied by alleging a statutory violation, as the Court previously explained, Mr. Light has not alleged that the Town violated 22 M.R.S. § 2423-A(2) by depriving Mr. Weaver of his caregiver's license. Third, with respect to section 2429-D(2), the Court has already concluded that Mr. Weaver did not meet the protections of section 2429-D for medical marijuana retail stores operating at the time the statute was enacted.

The Court therefore grants the Defendants' motion to dismiss as to Mr. Light's § 1983 claims against all individual defendants.

### D.       Count III: The Maine Freedom of Access Act

Mr. Light alleges that "[t]he Town of Livermore Planning Board, specifically James Manter, Kathleen Perkins, and Timothy Letourneau along with Livermore staff including Amy Byron, participated in an unlawful, unnoticed non-public deliberative meeting in violation of 1 M.R.S. §§ 403, 405 and 406." *Second Am. Compl.* ¶ 88.  The Defendants argue that Mr. Light's FOAA claims are untimely because, "violations of FOAA's public meeting requirements must be brought within 30 days of the alleged violations pursuant to M.R. Civ. P. 80B." *Defs.' Mot.* at 16.   In opposition, Mr. Light says that the 30-day provision "applies to failed production or failed allowance to inspect documents . . . not unlawful meetings. *Pl.'s Opp'n* at 19. He further alleges that "[e]ven if the 30 day limit applies, it would be appropriate to toll that application until after [the alleged unnoticed meeting] was discovered. *Id.* The Maine FOAA requires that an alleged "claim must be filed within thirty days of discovery of a possible violation." *Palmer v. Portland Sch. Comm.*, 652 A.2d 86, 89 (Me. 1995); *see also Dubois v. Town of Arundel*, No. AP-17-0024, 2018 Me. Super. LEXIS 46, at *10 (Me. Super Ct. Feb. 1, 2018).   "FOAA was enacted to ensure that public business is 'taken openly and that the records of [the public body's] actions [is] open to public inspection and their deliberations [are] conducted openly.'" *Dubois*, Me. Super LEXIS 46, at * 11 (quoting 1 M.R.S. § 401).

Preliminarily, the Court is unaware of authority that would allow the personal representative of an estate to initiate or maintain a FOAA claim on behalf of a decedent, but the parties did not adequately present this issue to the Court.

Moreover, Mr. Light cites no authority to support his contention that the 30-day time limit only applies to "failed production or failed allowance to inspect documents" and Maine case law is replete with examples of instances when courts have applied the 30-day time limit in cases not related to document production or inspection. *See, e.g.*, *Palmer*, 652 A.2d at 87, 89 (applying the 30-day FOAA time limit in a case involving closed deliberation); *Dubois*, 2018 Me. Super. LEXIS 46, at *3, 12 (involving allegations that "the distribution of [a letter] constituted an illegal executive session").

The Court therefore agrees that whether Mr. Light's FOAA complaint is timely depends on when Mr. Weaver or he discovered the alleged violation. However, the Amended Complaint is silent on when Mr. Weaver or Mr. Light discovered the alleged unnoticed meeting. This is ultimately a question of fact that makes dismissal of Mr. Light's FOAA claims inappropriate at this time.

Although dismissal of Mr. Light's FOAA claim is not warranted, "a stand-alone FOAA count does not belong in federal court." *Copp*, 2018 U.S. Dist. LEXIS 206973, at *62. As this Court explained in *Copp*, "[t]he Maine statute makes plain that the Superior Court of the state of Maine has exclusive jurisdiction over FOAA appeals." *Id.* at *62-63 (citing 1 M.R.S. § 409(2)). Furthermore, the First Circuit has explained that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.* At *63 (citing *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998)). This District routinely remands FOAA cases back to state court when the

81

Court has dismissed a plaintiff's federal claims giving the court jurisdiction, *see id.* (collecting cases).  The Court therefore remands Mr. Light's FOAA claim to the Androscoggin County Superior Court.

## VI.   CONCLUSION

The Court GRANTS the Defendants' Motion to Dismiss Amended Complaint for Failure to State a Claim (ECF No. 14) on all claims except Mr. Weaver's Freedom of Access Act claim and GRANTS the Defendants' Motion to Dismiss Count IV of Second Amended Complaint (ECF No. 31).  The Court REMANDS Richard Light's Freedom of Access claim to the Androscoggin County Superior Court for the state of Maine.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2022